EL PUEBLO DE PUERTO RICO, apelado, *v.* ELLIOT RIVERA NAZARIO, acusado y apelante.

*Número:* CR-93-98 *Resuelto:* 7 de noviembre de 1996

*Wanda T. Castro Alemán,* de la *Sociedad para Asistencia Legal,* abogada del apelante; *Pedro A. Delgado Hernández, Procurador General, Carlos Lugo Fiol, Subprocurador General,* y *Grisel Hernández Esteves, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Elliot Rivera Nazario fue hallado culpable por los delitos de asesinato en primer grado, secuestro y robo. En apelación, señala la comisión de seis (6) errores. En primer lugar, nos corresponde determinar si unos artículos publicados en el periódico *El Vocero de Puerto Rico* (en adelante *El Vocero*), al ser leídos por varios miembros del Jurado en la etapa del *voir-dire*, tuvieron el efecto de privar al acusado de su derecho a un juicio justo e imparcial y del debido procedimiento de ley. Además, debemos evaluar si al admitir cierta evidencia el tribunal de instancia cometió un error que amerite la revocación de la sentencia. Finalmente, debemos determinar si la evidencia presentada por el Estado demostró que se configuró el delito de secuestro.

Luego de examinar cuidadosamente la exposición narrativa de la prueba, la transcripción parcial de los procedimientos y los alegatos de las partes, estamos en posición de resolver.

## I

La prueba aquilatada y creída por el Jurado confirmó la teoría de los hechos expuesta por el Estado. La testigo María Santos Lugo declaró bajo inmunidad que conoció a Elliot Rivera Nazario el 15 de marzo de 1992 en el apartamento de un amigo en Levittown. Al día siguiente se encontró en el Cantón Mall de Bayamón con Rivera Nazario y con un menor de edad (en adelante M.R.), entre otras personas. Estando allí se dirigieron al salón de juegos *Fantasy Land*. Al cabo de un rato, la testigo caminó sola hasta el terminal de guaguas públicas en busca de transportación. Eran aproximadamente las 5:20 P.M. y a esa hora no había transportación disponible para Levittown.

Santos Lugo regresó al Cantón Mall, donde se encontró una vez más con Rivera Nazario y M.R. Los tres (3) caminaron por la Carretera Núm. 167 en dirección a Comerío, hasta que llegaron al área de la plazoleta de Forrest Hills. Desde allí, utilizando un teléfono público, la testigo solicitó un taxi para que los llevara a Levittown. Aproximada-

mente cinco (5) minutos después se presentó en el lugar el taxista Rafael Márquez Fontánez y los recogió.

La testigo se colocó en el asiento delantero del pasajero, mientras que Rivera Nazario y M.R. se ubicaron en el asiento trasero del vehículo. Durante el trayecto hacia Levittown la testigo miró hacia atrás y se percató de que Rivera Nazario tenía un arma de fuego de color negro en la mano, éste le hizo un gesto con el arma, ella se puso nerviosa y se volteó hacia el frente.

Más adelante, M.R. le dijo al taxista que se detuviera. Rivera Nazario le pasó el arma al menor y éste le dijo al taxista: "Esto es un asalto cabrón, no te muevas ni mires para atrás." La víctima hizo un gesto y M.R. lo golpeó con el arma causándole una herida en la cabeza. Entonces el acusado tomó el arma y le dijo a Santos Lugo que condujera el vehículo. Márquez Fontánez se rodó al asiento del pasajero y la testigo tomó el volante. Rivera Nazario ordenó a la víctima que se quitara la ropa y que le entregara las prendas y el dinero, lo cual hizo.

Al llegar cerca del negocio El Caracol, Rivera Nazario le ordenó a la testigo que virara en dirección hacia Cataño. Posteriormente, viraron y se dirigieron a Dorado por la Carretera Núm. 167. En el trayecto hacia Dorado, Rivera Nazario le dijo que detuviera el vehículo. El Sr. Rafael Márquez imploró por su vida, pidiendo que le llevaran todo, que él estaba dispuesto a ofrecer una descripción falsa de quienes lo asaltaron, pero que no lo mataran. E.N.P., pág. 35. Le suplicó a la testigo que intercediera por él, a lo que ella respondió que no podía hacer nada. Íd. Entonces el menor agarró a la víctima y lo haló fuera del vehículo, mientras el acusado esperaba con el arma fuera del auto. Acto seguido, la testigo vio cuando Rivera Nazario le disparó por la espalda a la víctima. Luego se volteó y escuchó cuatro (4) o cinco (5) detonaciones más. De inmediato, el acusado y el menor entraron en el automóvil y abandonaron a la víctima en el lugar.

El 20 de marzo de 1992 el cadáver de Rafael Márquez Fontánez fue hallado boca abajo en un terreno yermo cerca

de la Carretera Núm. 167 que va de Dorado hacia Cataño. Luego de la investigación policial correspondiente, el 27 de abril de 1992 el Ministerio Público sometió denuncias contra Elliot Rivera Nazario por los delitos de asesinato en primer grado, secuestro, robo e infracciones a los Art. 6 y 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416–418. Luego de varias suspensiones, el 14 de diciembre de 1992 comenzó el juicio con la juramentación preliminar del primer panel de candidatos a jurados.

Tras la celebración del juicio en su fondo, el Jurado emitió el veredicto de culpabilidad por todos los delitos imputados. El 5 de marzo de 1993 el Hon. Rodolfo Cruz Contrera, Juez del Tribunal Superior, Sala de Bayamón, dictó una sentencia condenatoria contra Rivera Nazario.

De esta sentencia apela el convicto y señala la comisión de varios errores. En síntesis, señala que erró el tribunal de instancia: (1) al no disolver el panel de jurados luego de que varios de sus miembros tuvieran contacto con cierta información periodística sobre el caso; (2) al no permitirle recusar motivadamente a todos los candidatos que estuvieron en contacto con la información periodística; (3) al admitir en evidencia un testimonio sobre la confesión del acusado; (4) al admitir en evidencia fotografías grotescas del cadáver de Rafael Márquez Fontánez; (5) en el efecto acumulativo de los errores, y (6) en que no se configuró el delito de secuestro.

## II

En sus primeros dos (2) señalamientos de error, el apelante Rivera Nazario argumenta que dos (2) artículos publicados en el periódico *El Vocero* y leídos por varios miembros del panel de jurados durante la etapa del *voir-dire* le privaron de su derecho a un juicio justo e imparcial. Alega que el tribunal debió disolver el panel de jurados una vez determinó que la mayoría había estado en contacto con la información periodística. En la alternativa, señala que debió permitírsele a la defensa la recusación motivada de to-

dos los candidatos que leyeron alguno de los artículos de *El Vocero*.

■ Una vez más nos corresponde determinar el alcance del derecho del acusado a un juicio justo e imparcial frente a la libertad de prensa y el derecho del pueblo a estar informado sobre los incidentes de un proceso penal. Nuestro orden constitucional garantiza a todo acusado el derecho a un juicio público, justo e imparcial. Emda. VI, Const. EE. UU., L.P.R.A., Tomo 1; Art. II, Sec. 11, L.P.R.A., Tomo 1. En particular, nuestra Constitución consagra expresamente el derecho de todo acusado de un delito grave a que su juicio se ventile ante un Jurado imparcial. Además, tiene derecho a que se le pruebe la acusación mediante prueba admisible y no por influencias extrañas al proceso. Por ello, la publicidad adversa que se despliega con antelación al juicio tiene particular relevancia para el tribunal, dada la posibilidad de que menoscabe los mencionados derechos del acusado.

■ Sin embargo, es un principio firmemente establecido en nuestra jurisprudencia que la publicación de noticias acerca de los hechos e incidentes de un proceso penal no violenta per se el derecho constitucional del acusado a un juicio justo e imparcial. Como la criminalidad es uno de los problemas principales de nuestros tiempos, la ciudadanía sigue muy de cerca los actos delictivos más notorios y tiene interés en los procesos judiciales que se inicien contra los imputados de los actos delictivos. *Pueblo v. Moreno Morales I*, 132 D.P.R. 261 (1992); *Pueblo v. Hernández Mercado*, 126 D.P.R. 427 (1990); *Pueblo v. Lebrón González*, 113 D.P.R. 81, 86 (1982); *Pueblo v. Maldonado Dipini*, 96 D.P.R. 897 (1969). Constantemente hemos sostenido que "[l]a adjudicación hecha por el juzgador de hechos se encuentra permeada por una presunción de regularidad y corrección y de que el veredicto se sostiene a base de la prueba desfilada". *Pueblo v. Echevarría Rodríguez I*, 128 D.P.R. 299, 327 (1991). Véase *Pueblo v. Santiago Acosta*, 121 D.P.R. 727 (1988). El acusado es quien carga con "el

peso de la prueba para demostrar *afirmativa y satisfactoriamente* que las mismas fueron de tal naturaleza, impacto y exposición que le han privado de un juicio justo ante un jurado imparcial". (Énfasis suplido.) *Pueblo v. Lebrón González,* supra, pág. 86.

▮▮▮ Dentro de nuestra realidad social y geográfica no podría ser de otro modo. "Lo contrario, inhibiría el que fueran encausados acusados de gran notoriedad o casos revestidos de interés público en una sociedad democrática —que se caracteriza por el flujo de ideas y noticias." *Pueblo v. Lebrón González,* supra, pág. 86. Al evaluar en qué consiste un Jurado imparcial, debemos considerar que nuestro ordenamiento constitucional confiere a la libertad de prensa un lugar privilegiado dentro del sistema de libertades civiles. De otra parte, somos conscientes de que los medios de comunicación y difusión en esta era tecnológica poseen un grado altísimo de eficacia, rapidez y alcance. Por todo ello, en un país como el nuestro, de limitada extensión territorial y densamente poblado, sería prácticamente imposible formar un Jurado totalmente ignorante de los detalles de un crimen que por su naturaleza engendran publicidad y alcanzan notoriedad en nuestra jurisdicción. *Pueblo v. Miranda Santiago,* 130 D.P.R. 507 (1992). Hoy, más que nunca, "[l]a justicia no puede por tanto depender de la ignorancia, sino de la integridad de los jurados y de la firmeza de su compromiso de resolver guiados únicamente por la prueba que se presenta en juicio". Íd., pág. 511.

▮▮▮ De ahí que una alegación de prejuicio o parcialidad en un juicio por jurado no puede fundarse exclusivamente en la difusión de las noticias perjudiciales o inflamatorias. Quien alega tal prejuicio o parcialidad debe basar su reclamo en el efecto real que la información difundida haya tenido en el ánimo de los candidatos al Jurado. "A fin de cuentas, la verdadera encuesta en juicios expuestos a mucha publicidad es determinar el estado mental que pudo haber imperado entre el Jurado. Lo realmente importante no es si el Jurado conoció o recuerda el caso en par-

ticular por los informes de prensa, sino que puede juzgar imparcialmente." *Pueblo v. Miranda Santiago*, supra, pág. 512. Véanse: *Pueblo v. Moreno Morales I*, supra; *Pueblo v. Echevarría Rodríguez I*, supra.

Ahora bien, una vez el acusado haya demostrado que el caso ha generado publicidad masiva inflamatoria o altamente perjudicial con anterioridad al juicio, es deber de los tribunales de instancia tomar las medidas necesarias para evitar que los miembros del Jurado lleguen a juzgar el caso con una opinión ya formada. *Pueblo v. Echevarría Rodríguez I*, supra. El tribunal debe examinar en qué forma la información publicada ha influido el ánimo de los candidatos al Jurado, teniendo en cuenta que su mera exposición, aun tratándose de publicidad masiva o inflamatoria, no los descalifica automáticamente. Íd.

De otro lado, hemos expresado que "[l]os tribunales tienen los poderes y los instrumentos necesarios para seleccionar los candidatos idóneos y minimizar los efectos adversos de la publicidad anterior al juicio". *Pueblo v. Hernández Mercado*, supra, pág. 437. Entre los mecanismos que poseen los tribunales para tales propósitos, hemos reconocido los siguientes: (a) la celebración de un *voir-dire* exhaustivo y riguroso; (b) la concesión a las partes de recusaciones adicionales a las provistas por la Regla 123 de Procedimiento Criminal, 34 L.P.R.A. Ap. II; (c) secuestrar al Jurado una vez éste haya sido escogido y juramentado; (d) impartir instrucciones cuidadosas y detalladas a los jurados, y (e) finalmente y sólo en casos extremos en los cuales no sea posible utilizar los instrumentos antes mencionados para garantizar un juicio justo e imparcial, "el tribunal p[odrá] suspender los procedimientos al amparo de la Regla 109 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, o también puede ordenar el traslado a otra Sala". *Pueblo v. Hernández Mercado*, supra, pág. 438.

En casos cuando la publicidad surge antes o durante la etapa de desinsaculación del Jurado, el *voir-dire* se convierte en un mecanismo de vital importancia para

garantizar al acusado un juicio justo e imparcial.([1]) El magistrado que preside el proceso debe sopesar el impacto que la publicidad ha tenido en el ánimo de los candidatos, con el fin de "garantizar que el Jurado que intervendrá en el proceso como juzgador supremo de los hechos será uno imparcial, capacitado y libre de prejuicio". En tales casos es recomendable que se lleve a cabo "un *voire dire* extenso y riguroso que le permita indagar sobre la exposición que han tenido los candidatos a información periodística y la naturaleza de los datos obtenidos a través de las noticias". *Pueblo v. Hernández Mercado*, supra, pág. 437.

 Cada caso deberá juzgarse según sus hechos particulares considerando el *perjuicio real* que pudo causar la información publicada en vista de la totalidad de las circunstancias. El profesor Chiesa resume algunos de los principales factores que han de ser considerados para determinar el *perjuicio real* sufrido: (1) la naturaleza cuantitativa y cualitativa de la publicidad; (2) las medidas tomadas por el tribunal para contrarrestar el potencial del perjuicio; (3) los reclamos del acusado; (4) la determinación de si el Jurado tuvo en efecto conocimiento de información del caso a través de los medios noticiosos; (5) si tal información recibida por el juzgador fue objeto de prueba en el juicio y si se trata de materia admisible como prueba; (6) la disposición de los jurados para emitir su veredicto sólo con base en la prueba, descartando la información extrínseca originada por la publicidad del caso, y (7) la conducta del Ministerio Fiscal. E.L. Chiesa Aponte, *Derecho procesal pe-*

---

([1]) El Tribunal Supremo federal, al enfrentarse al problema de publicidad previa en juicios criminales, ha reconocido la amplia discreción de que gozan los tribunales de instancia en cuanto a la forma en que llevan a cabo el *voir-dire* para detectar parcialidad en el Jurado:

"... our own cases have stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias. Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation any such claim his own perception of the depth and the extent of news stories that might influence a juror." *Mu'min v. Virginia*, 500 U.S. 415, 427 (1991).

*nal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1992, Vol. II, Sec. 13.3, págs. 223–232.

A la luz de los criterios expuestos, nos corresponde determinar si el apelante demostró que, a pesar de las medidas tomadas por el magistrado en la etapa del *voir-dire*, las noticias publicadas tuvieron el efecto de privarle de un juicio justo e imparcial. Veamos.

## III

El 15 de diciembre de 1992, el *El Vocero* publicó un artículo titulado *"Abre juicio asesinato taxista"*, en el cual se hizo referencia a ciertas conversaciones alegadamente llevadas a cabo entre la defensa y la Fiscalía. El artículo específicamente expresó lo siguiente:

> ... Fueron numerosas las conversaciones que hubo entre el fiscal especial general del Departamento de Justicia, Rafael M. Pagán y el abogado del acusado José Ruiz Santiago, de Asistencia Legal, éste último buscando un arreglo para rebajar la acusación o alguna promesa que beneficie a su representado, mientras que el Fiscal está renuente a conceder algún beneficio. Anejo II, pág. 2.

En éste, además, se citaron unas expresiones alegadamente hechas por el acusado minutos después de haber dado muerte a la víctima: "Es como matar un gato, mira como brincaba ese ca...., parecía un conejo, ¿viste que gracioso es?, es como matar un gato en la calle". Íd.

Durante el proceso de desinsaculación del Jurado, el mismo día cuando se publicó el artículo, la defensa solicitó la disolución del panel de jurados y la posposición del juicio, alegando que la información publicada impedía que los jurados pudieran emitir un veredicto imparcial. Sobre este aspecto expresó:

> ... nosotros entendemos que esa información que ha reflejado ese jurado, panel de 25, es muy probable que haya contaminado el panel completo en el octavo piso y entendemos que no se, que no hay forma de subsanar este error en estos momentos. En-

tendemos que el proceso está completamente maculado y que seguir adelante con estos procedimientos, de la siguiente forma y siguiendo con esos mismos jurados 0–36 o trayendo otros jurados, miembros del mismo panel del octavo piso, consistiría en un juicio injusto, parcializado y maculado.... T.E., pág. 63.

El tribunal de instancia denegó la solicitud. Sostuvo que ella era prematura e infundada en esta etapa, aclarando que bastaba con detallar las instrucciones al Jurado y llevar a cabo un *voir-dire* extenso y riguroso, para subsanar el posible efecto perjudicial del artículo. T.E., pág. 68.

Al día siguiente la defensa presentó de nuevo una moción para solicitar la disolución del panel y la posposición del juicio, con los mismos fundamentos del día anterior, añadiendo que se había publicado un segundo artículo en *El Vocero* sobre el caso. El segundo artículo de 16 de diciembre se titulaba *En Juicio Asesinato Taxista Citan Derecho Prensa y Acusado*. En éste se reseñaron los planteamientos formulados por la defensa en sala durante el día anterior y se repitieron las expresiones del acusado, luego que diera muerte al taxista Rafael Márquez Fontánez.

Examinada la Moción de 16 de diciembre y escuchadas las partes, el tribunal de instancia la declaró no ha lugar fundamentándose en la norma de que el mero contacto con información periodística sobre un caso no es fundamento para descalificar a los miembros del Jurado o posponer el juicio. Añadió como fundamento que en la etapa de *voir-dire* lo esencial es determinar si los jurados pueden cumplir su función de forma objetiva e imparcial, a base de la prueba presentada en el juicio.

Oportunamente, Rivera Nazario recurrió al Tribunal de Apelaciones mediante un *certiorari* y solicitó que se disolviera el panel de jurados. Dicho tribunal declaró no ha lugar dicha solicitud, en vista de que no se había constituido el Jurado definitivamente, e instruyó al tribunal de instancia sobre la importancia de que se llevase a cabo un riguroso *voir-dire* en éste. Posteriormente, el juicio continuó hasta culminar con el fallo condenatorio.

## IV

Tratándose solamente de dos (2) artículos periodísticos, es evidente que no estamos ante un caso de publicidad masiva o intensa contra el acusado.([2]) Sin embargo, la cantidad de la información publicada no es el único criterio que se debe tomar en cuenta para medir el efecto perjudicial de la publicidad en el ánimo de los jurados. Es concebible que en ciertos casos excepcionales, aun cuando la difusión de la información sobre el caso sea limitada, la naturaleza perjudicial y las circunstancias de la publicación sean tales que provoquen un menoscabo en el derecho a un juicio imparcial del acusado. Precisamente lo que plantea el apelante es que la información publicada en este caso, aunque contenida en sólo dos (2) artículos, era tan perjudicial que el mero contacto con ella en esa etapa manchaba radicalmente la pureza del proceso, pues impedía que los candidatos a Jurado pudiesen emitir una decisión imparcial, fundamentándose únicamente en la prueba desfilada. No le asiste la razón.

De los autos surge que el tribunal de instancia empleó los recursos necesarios y tomó las medidas adecuadas para eliminar el potencial perjuicio que la información publicada podía causar. El proceso de desinsaculación del Jurado comenzó el 15 de diciembre de 1992. El tribunal de instancia impartió las instrucciones generales a los miembros del Jurado. En particular, les instruyó debidamente sobre la presunción de inocencia, la duda razonable, el silencio del acusado y las normas de evaluación de la prueba. Como parte del *voir-dire*, el tribunal preguntó a los candidatos a jurados si alguno se había enterado del caso a través de los medios de comunicación. Surgió entonces que diecisiete (17) de los veinticuatro (24) candidatos a jurados

---

([2]) En anteriores ocasiones hemos atendido planteamientos similares por publicidad masiva o intensa. En *Pueblo v. Hernández Mercado*, 126 D.P.R. 427 (1990), se presentaron ocho (8) artículos en un período de diez (10) días durante el juicio. En *Pueblo v. Pérez Santaliz*, 105 D.P.R. 10 (1976), se trataba de nueve (9) noticias. En ambos casos este Tribunal confirmó la validez de las convicciones.

se enteraron del caso mediante el artículo publicado en *El Vocero* el 15 de diciembre. E.N.P., pág. 1. Catorce (14) de ellos advinieron en contacto con dicho artículo mientras esperaban ser llamados en el salón de los jurados del propio tribunal. Seis (6) de los veinticuatro (24) candidatos del panel afirmaron no haber leído el artículo.([3])

El tribunal reiteró que la misión del Jurado consiste en resolver el caso exclusivamente a base de la prueba presentada y admitida por el tribunal. De manera expresa, aclaró que "lo que dice la prensa no es prueba". T.E., pág. 33. El tribunal preguntó a cada miembro del panel si, a pesar de haber leído la información sobre el caso en la prensa o de haber visto la televisión u oído la radio, podía evaluar el caso objetivamente, si su capacidad objetiva era suficiente para desechar la información recibida fuera del tribunal y resolver única y exclusivamente a base de la prueba desfilada. Todos y cada uno contestaron en la afirmativa.

El 21 de diciembre de 1992 se juramentó preliminarmente un nuevo grupo de diez (10) candidatos a jurados. Cuatro (4) de ellos admitieron haberse enterado del caso a través de *El Vocero*. La defensa utilizó las recusaciones perentorias que le restaban para un total de diez (10). Luego de efectuado el *voir-dire*, al día siguiente fue juramentado definitivamente el panel de doce (12) jurados y dos (2) suplentes.

Como surge de la transcripción de la prueba, se interrogó extensamente a los candidatos sobre la información leída en los artículos y sobre el recuerdo de los candidatos sobre ella. Tanto el tribunal como la defensa formularon numerosas preguntas para auscultar el posible efecto de la noticia publicada en el ánimo y la capacidad del Jurado para aquilatar la prueba de forma objetiva. Ninguno de los candidatos mostró indicios de parcialidad o el ánimo pre-

---

([3]) Un candidato del grupo de veinticinco (25) que no había leído el artículo, con el consentimiento del tribunal y la anuencia de las partes, fue excusado por razones personales.

venido a raíz de la información periodística. Por el contrario, todos demostraron que comprendían las instrucciones cautelares ofrecidas por el tribunal de instancia y que se encontraban en condiciones de juzgar el caso en forma objetiva y a base exclusivamente de la prueba desfilada.

El apelante sostiene que la información más perjudicial publicada en *El Vocero* fue la referente a una posible declaración de culpabilidad por parte del acusado. Según surge del expediente, uno de los artículos publicados aludía a numerosas conversaciones entre el Fiscal y el abogado del acusado, este último "buscando un arreglo para rebajar la acusación o alguna promesa que beneficie a su representado". *El Vocero* de 15 de diciembre de 1992. La información noticiosa sobre una posible alegación de culpabilidad implica evidencia claramente inadmisible y cuyo potencial efecto perjudicial es considerable.

Sin embargo, a diferencia de lo que sostiene el apelante, el caso de autos se distingue con claridad de *Pueblo v. Robles González*, 125 D.P.R. 750 (1990). En el caso ante nos, la información alegadamente perjudicial surge de un sólo artículo de periódico que no formó parte de la prueba presentada.(4) Además, la publicación surgió en la etapa de desinsaculación del Jurado, lo que le permitió al Tribunal y a las partes auscultar con rigurosidad el posible efecto perjudicial de ella en el ánimo de los candidatos a jurados mediante *voir-dire* exhaustivo.

Por último, cabe señalar que, como cuestión de hecho, sólo uno (1) de los candidatos al Jurado contestó que, a su entender, las conversaciones mencionadas en *El Vocero* se referían a una oferta del acusado para que se declarase culpable por un delito menor. Alegato del apelante, págs. 2–3. Este candidato (Alberty), a pesar de que en el *voir-dire* contestó constantemente que no le daría peso a la información publicada y que no la consideraría en lo absoluto

---

(4) El único artículo que hace referencia a las conversaciones entre la fiscalía y la defensa fue publicado el 15 de diciembre de 1992. El artículo de 16 de diciembre no hace referencia directa a tales conversaciones.

al aquilatar la prueba, fue recusado de forma perentoria por la defensa.

Por otra parte, en cuanto a las alegadas expresiones hechas por el acusado luego de dar muerte a la víctima, reconocemos que son de carácter inflamatorio. Sin embargo, se trataba de información que formaba parte de la prueba admisible que desfiló como evidencia en el juicio. Dichas expresiones fueron reproducidas *ad verbatim* por la testigo principal de cargo y el acusado tuvo plena oportunidad de confrontarse con dicha prueba en el juicio. Esta parte de la información publicada pasó en su momento por el tamiz del juicio y, por lo tanto, el acusado tuvo la oportunidad de confrontarlo en el proceso adversativo. Por tal razón, su efecto perjudicial se redujo al mínimo. *Pueblo v. Pérez Santaliz*, 105 D.P.R. 10, 15 (1976). Además, el tribunal de instancia ofreció detalladas y enfáticas instrucciones.

Debe señalarse que sólo cuatro (4) de los doce (12) miembros del Jurado que emitió el veredicto *recuerdan* haber leído alguno de los artículos sobre el caso publicados en la prensa. Surge con claridad de la transcripción de la evidencia que todos y cada uno de ellos demostraron su capacidad para juzgar el caso de forma objetiva e imparcial y sólo a base de la prueba desfilada. Habiendo examinado la cantidad y el contenido de la información publicada en los artículos en cuestión, es forzoso concluir que las medidas tomadas por el Tribunal en la etapa de desinsaculación del Jurado fueron más que suficientes para garantizarle al acusado su derecho a un juicio justo ante un jurado imparcial. Resolvemos que el apelante no probó satisfactoriamente que la información publicada tuvo el efecto de menoscabar sus derechos constitucionales y, por lo tanto, no destruyó la presunción de regularidad y corrección de que goza la adjudicación hecha por el Jurado. *Pueblo v. Echevarría Rodríguez I*, supra.

En las circunstancias descritas y a tenor con la normativa jurisprudencial expuesta, la determinación del tribunal de instancia de denegar la posposición del juicio y la disolución del Jurado merece nuestra mayor deferencia.

Asimismo, no habiéndose demostrado satisfactoriamente el efecto perjudicial de los artículos publicados, tampoco erró el tribunal de instancia al denegar las recusaciones de todos los jurados que tuvieron contacto con los artículos periodísticos, solicitadas por la defensa. Véase *Ross v. Oklahoma*, 487 U.S. 81 (1988).

▮ Finalmente, es menester señalar que en un momento del proceso de desinsaculación, la defensa responsabilizó al Ministerio Público por alegadamente haber filtrado la información sobre el caso a la prensa. Aunque esta imputación de conducta indebida no se demostró en forma alguna, debemos recalcar que tanto los abogados como los fiscales tienen un deber ético ineludible en los procesos criminales en que participan de abstenerse de publicar o de cualquier manera facilitar la publicación, en periódicos o a través de otros medios informativos, de detalles sobre casos criminales pendientes. Canon 13 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX. Esto es así precisamente porque "tales publicaciones pueden obstaculizar la celebración de un juicio imparcial y perjudicar la debida administración de la justicia". Íd.

▮ No somos ajenos a que en la práctica pueden ocurrir este tipo de filtraciones de información a los medios noticiosos. Advertimos que dichas prácticas representan una conducta antiética que pone en peligro la pureza del proceso. En aras de evitar estas situaciones que pueden obstaculizar la celebración de un juicio justo e imparcial, el Ministerio Público, como representante del Estado, debe ser especialmente cuidadoso al custodiar toda la evidencia e información relacionada con un caso criminal, para así evitar que su publicación prematura menoscabe las garantías contitucionales que protegen al acusado.

## V

El apelante señala como tercer error que la confesión extrajudicial debió ser excluida por dos (2) fundamentos:

(1) que ella se obtuvo en violación de los derechos básicos que asistían al acusado y (2) que el testimonio sobre ésta no reunía suficientes garantías de confiabilidad.

A. *Primer fundamento: alegada violación de los derechos del acusado*

Como reconoce en su alegato, este primer fundamento no fue presentado por el apelante en ningún momento durante el proceso en instancia. A estos efectos, como regla general, no se revocará sentencia o decisión alguna por motivo de error en la admisión de evidencia, a menos que la parte perjudicada por la admisión la haya objetado oportuna y correctamente en el tribunal de instancia. Regla 4 de Evidencia, 32 L.P.R.A. Ap. IV. Por tal razón, las objeciones que no se realizan oportunamente en el proceso de instancia se entienden renunciadas y, como norma general, no serán examinadas en la etapa apelativa. Íd.

▮ Ante estas circunstancias, el apelante recurre a la Regla 6 de Evidencia, 32 L.P.R.A. Ap. IV, y nos solicita que revisemos el error señalado. Dicha regla dispone que los tribunales apelativos están facultados para revisar los errores *crasos y perjudiciales* en la admisión o exclusión de evidencia, aun en ausencia de objeción oportuna y correcta, "cuando el no corregirlos resulte en un fracaso de la justicia". (Énfasis suprimido.) *Pueblo v. Ruiz Bosch*, 127 D.P.R. 762, 783 (1991).

La discusión del primer fundamento del error se refiere a dos (2) aspectos sobre la alegada violación de los derechos básicos del acusado: Primero, la alegada ilegalidad de la custodia original de los agentes de la División de Robos, y segundo, la validez de la intervención y el interrogatorio del agente Quiñones que culminaron en la confesión extrajudicial.

El apelante alega que no se demostró la legalidad de la custodia en que Rivera Nazario se encontraba bajo los agentes de la División de Robos de la Policía. Sin embargo, el recurso apelativo está huérfano de alegaciones específicas que arrojen el menor indicio de ilegalidad en dicho

confinamiento. No basta con una mera alegación de que dicho confinamiento pudo ser irrazonable para que revisemos el error a base de que hubo un fracaso de la justicia.[5] En este caso el apelante no nos pone en condiciones de resolver el anterior planteamiento de error según la Regla 6 de Evidencia, *supra*.

De otra parte, el apelante sostiene que independientemente de la validez del confinamiento de Rivera Nazario por razones exógenas a los hechos de este caso, la intervención y el interrogatorio del agente Quiñones fueron irrazonables. Tampoco le asiste la razón.

Como se desprende de la exposición narrativa de la prueba, el agente Quiñones testificó que al tercer o cuarto día de haberse encontrado al occiso, recibió una confidencia anónima por vía telefónica que señalaba al acusado Elliot Rivera Nazario como autor de los crímenes cometidos contra el taxista Rafael Márquez Fontánez.[6] Desde ese momento el agente tuvo elementos suficientes para comenzar una investigación dirigida a encontrar y entrevistar a la persona identificada.

En efecto, antes de comenzar la búsqueda activa, descubre casualmente que el acusado se encuentra confinado y que agentes de la División de Robos de la Policía lo estaban interrogando por motivo de otros casos de robo no relacionados a los del caso de autos. E.N.P., pág. 18. Específicamente manifestó que "al momento de hacer la entrevista el acusado se encontraba *bajo la custodia de los agentes de robo y se encontraba confinado*". (Énfasis suplido.) E.N.P., pág. 18. El agente Quiñones solicitó entonces el permiso de los agentes que custodiaban a Rivera Nazario y lo trasladó a la División de Homicidios del C.I.C. en Bayamón.

---

[5] En apelación se limita a sostener que "[t]ampoco se estableció que éste [el acusado] estuviera legalmente detenido por los agentes de la División de Robos". Esta alegación no es suficiente para determinar que revisemos por el fundamento de "fracaso de la justicia".

[6] La confesión extrajudicial de Rivera Nazario fue presentada mediante el testimonio del agente de la Policía José Quiñones. Luego de celebrar una vista bajo la Regla 9(C) de Evidencia, 32 L.P.R.A. Ap. IV, en ausencia del Jurado, el magistrado determinó que el testimonio de la confesión era admisible.

■ .En el *ejercicio razonable* de su deber, como agente del orden público, de investigar toda querella sobre actividades delictivas, el agente Quiñones procedió a interrogar al apelante e inquirir sobre su posible participación en el asesinato del taxista. *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139, 144 (1985); *Pueblo v. Ruiz Bosch*, supra. Un examen de los hechos de este caso refleja que no estamos ante una intervención por parte del agente Quiñones que violentara el derecho del acusado contra los registros y las incautaciones irrazonables. En las circunstancias descritas, el agente Quiñones no estaba obligado a acudir ante un magistrado en busca de una orden judicial para interrogar a una persona que ya se encontraba privada de su libertad y confinado por otros delitos. Un agente del Estado, como parte de una investigación criminal, puede *interrogar* a un sospechoso bajo custodia policial por causa de otros delitos no relacionados con la investigación que lleva a cabo. *Mathis v. United States*, 391 U.S. 1, 20 (1968); *cf. Illinois v. Perkins*, 496 U.S. 292 (1990). Por lo tanto, es forzoso concluir que su intervención fue razonable. Procede entonces examinar otros aspectos sobre la admisibilidad de la declaración incriminatoria del acusado. Veamos.

■ La admisibilidad de cualquier declaración incriminatoria de un acusado está sujeta a las normas evidenciarias establecidas en las reglas, independientemente de la validez de su obtención. De otro lado, aun cuando cumpla con las Reglas de Evidencia, la admisión deberá ser excluida si fuese obtenida en violación a los derechos constitucionales del acusado. Chiesa, *op. cit.*, pág. 108.

■ La admisión o confesión puede ser traída mediante el testimonio de la persona a quien el acusado hizo las declaraciones incriminatorias, siempre que se satisfagan las exigencias probatorias sobre la prueba testifical. Íd., pág. 9. Un ejemplo de este tipo de admisión fue validado en el caso *Pueblo v. López Guzmán*, 131 D.P.R. 867 (1992). En dicho caso se trataba de una admisión extrajudicial hecha por un sospechoso la cual no fue producto de

un interrogatorio y fue admitida en evidencia mediante el testimonio del policía que la escuchó.

■ Por otro lado, la validez y admisibilidad de cualquier declaración incriminatoria, que sea producto de un interrogatorio bajo custodia policial, dependerá de que ésta se ofrezca de forma voluntaria y de que sea precedida por las debidas advertencias de los derechos al acusado (*Miranda Warnings*). *Mathis v. United States*, supra, pág. 20. Únicamente son admisibles "cuando el Estado demuestra que dichas manifestaciones fueron precedidas por una renuncia voluntaria, consciente e inteligente del derecho contra la autoincriminación". (Énfasis suprimido.) *Pueblo v. Ruiz Bosch*, supra; *Pueblo en interés menor J.A.B.C.*, 123 D.P.R. 551, 561 (1989); *Miranda v. Arizona*, 384 U.S. 436 (1966).

En *Pueblo v. Ruiz Bosch*, supra, pág. 775, citando a *Pueblo en interés menor J.A.B.C.*, supra, págs. 561–562, nos expresamos sobre los elementos de validez de una renuncia al derecho a no autoincriminarse:

> Una renuncia del mencionado derecho es "voluntaria" *cuando la misma es realizada* sin que haya mediado intimidación, coacción, o violencia por parte de los funcionarios del Estado en el procedimiento que culmina en la toma de la confesión. *Colorado v. Connelly*, 479 U.S. 157 (1986).
> Por otro lado, y en palabras del Tribunal Supremo Federal, una renuncia de esta naturaleza puede ser considerada como una "consciente e inteligentemente" realizada *cuando el sospechoso o imputado es informado, en forma apropiada*, del privilegio constitucional contra la auto incriminación; incluyendo *la advertencia crucial* de que cualquier manifestación que haga al respecto podrá ser usada en su contra en un proceso criminal. *Colorado v. Spring*, 107 S.Ct. 851 (1987). (Énfasis en el original.)

■ A partir del caso *Miranda v. Arizona*, supra, tanto la jurisprudencia federal como la nuestra han exigido que, para que una renuncia del derecho constitucional a no incriminarse se considere realizada en forma "consciente e inteligente", el Estado debe informarle de manera eficaz al sospechoso o imputado de sus derechos. Aunque no se re-

quiere un lenguaje talismánico, en esencia, las advertencias deben informar al imputado: "que tiene el derecho a permanecer callado; que cualquier manifestación que haga podrá ser utilizada como evidencia en su contra; que tiene el derecho a consultar un abogado de su selección antes de decidir si declara o no y contar con la asistencia de éste durante el interrogatorio; y que de no tener dinero para pagar un abogado, el Estado viene en la obligación de proveérselo". (Citas omitidas.) *Pueblo v. Ruiz Bosch*, supra, pág. 776. Véase *Pueblo en interés menor J.A.B.C.*, supra, pág. 562.

"A los fines de determinar si esa renuncia al derecho contra la autoincriminación es o no una válida en derecho, los tribunales deben examinar la 'totalidad de las circunstancias' que rodearon la confesión obtenida por los funcionarios del Estado." (Énfasis suprimido.) *Pueblo v. Ruiz Bosch*, supra, pág. 776. Es precisamente al Ministerio Público a quien le corresponde el peso de la prueba de demostrar que se le formularon las advertencias al imputado y que éste renunció a su derecho a no incriminarse en forma voluntaria, consciente e inteligente. Íd.

Por otra parte, nuestra jurisprudencia ha reiterado la norma de que es necesario establecer prueba del *corpus delicti*, independiente de las declaraciones incriminatorias, que tienda a confirmar la confesión o las admisiones del acusado. *Pueblo v. Fradera Olmo*, 122 D.P.R. 67 (1988). El propósito de tal doctrina es el de "proteger al acusado de confesiones o admisiones falsas". Por virtud de dicha norma, una confesión o admisión por sí sola no es suficiente para establecer la culpabilidad del acusado.

Según se desprende de la transcripción de la evidencia que ordenáramos, el testimonio del agente Quiñones, que mereció la entera credibilidad del juzgador de los hechos, demostró que la confesión fue ofrecida por el acusado voluntaria, consciente e inteligentemente. Rivera Nazario fue advertido de que era sospechoso del caso de asesinato y

el agente Quiñones le leyó en voz alta las advertencias siguientes, que tenía escritas en una tarjeta:

Usted está aquí como sospechoso o presunto acusado y antes de hacerle cualquier pregunta quiero advertirle sus derechos. Usted tiene el derecho a permanecer callado y a no declarar. Cualquier cosa que usted diga puede ser usado en su contra. Usted tiene el derecho de hablar con un abogado para que le aconseje antes de yo hacerle cualquier pregunta y, además, dicho abogado puede acompañarlo durante el interrogatorio. Si usted no puede pagar un abogado le conseguiré uno antes de interrogarlo, libre de costo alguno, si así lo desea. Si usted decide contestar mis preguntas sin estar asistido de un abogado puede negarse a contestar cualquiera pregunta y en cualquier momento dejar de contestar y solicitar asistencia legal.
Su declaración tiene que ser libre, voluntaria y espontánea y no se puede ejercer ninguna presión ni amenaza, ni coacción, o intimidación para obligarle a declarar. ¿Ha entendido lo que le he explicado? ¿Desea declarar? T.E., pág. 69.

Según el testimonio del agente, el acusado le expresó que entendió cada una de las advertencias leídas por él. El agente Quiñones le preguntó si conocía algo sobre el asesinato del taxista Rafael Márquez Fontánez, ocurrido el 16 de marzo de 1992. Según Quiñones, inicialmente el acusado estaba negativo, pero luego de una serie de preguntas el acusado expresó: "lamentablemente yo fui quien mató a ese señor." E.N.P., pág. 18. Luego el apelante relató con detalles los hechos del crimen. Además, el imputado indicó que no actuó sólo; que estuvo acompañado por una dama y un menor. E.N.P., pág. 18. Rivera Nazario se refirió a la dama por el apodo "Mita", quien al ser localizada resultó ser María Santos Lugo, la principal testigo de cargo.

La entrevista duró aproximadamente una hora y se llevó a cabo en presencia de su supervisor, el Sargento Ramón Durán. El agente afirmó que el acusado se encontraba tranquilo durante el interrogatorio. Según se desprende de los hechos probados y creídos en instancia, no hay indicios de que la confesión se ofreció en contra de la voluntad del apelante y que por ello proceda la supresión. Al acusado se le advirtió detalladamente de sus derechos, y la atmósfera total de la confesión muestra ausencia de intimidación,

coacción o violencia. Tampoco se trata de manifestaciones obtenidas por el Estado *de modo subrepticio o doloso* mientras el acusado se encuentra bajo custodia. Véase *Pueblo v. Ruiz Bosch*, supra.

B. *Segundo fundamento: que en la preservación del testimonio no se reunieron suficientes garantías de confiabilidad.*

Contrario al primer fundamento antes discutido, el apelante presentó oportunamente en instancia el planteamiento de que no era admisible en evidencia la confesión prestada por el acusado, ya que el agente no recordaba la fecha exacta de dicho testimonio ni éste tomó medida alguna para preservarla en el momento. Lo anterior surge del propio testimonio del agente Quiñones. El apelante acude ante nos para señalar que dicha admisión por parte del tribunal de instancia constituyó un abusó de su discreción por tratarse de un testimonio sin suficientes garantías de confiabilidad.

Las normas firmemente establecidas en la jurisdicción federal sobre las confesiones orales como medios efectivos de prueba, resulta perfectamente compatible con nuestras Reglas de Evidencia. Una confesión puede ser oral o escrita, o ser en parte oral y en parte escrita. Véanse: *Thomas v. United States*, 15 F.2d 958 (8vo Cir. 1926); *State v. Bickhman*, 121 So.2d 207 (1960), *cert.* denegado, *Bickham v. Louisiana*, 364 U.S. 874 (1960). Una confesión oral puede ser probada en un juicio mediante el testimonio de la persona que la escuchó, aunque ella no haya sido preservada por otros medios. *People v. Cokahnour*, 52 P. 505 (1898).

Reconocemos que la práctica policial más deseable es que al emitirse una declaración de carácter incriminatorio por parte de un sospechoso bajo custodia, el agente a quien se le ofrece tome las medidas para preservarla, ya sea por escrito o utilizando los servicios de un taquígrafo. En ausencia de tales mecanismos, al rendirse el informe policial debe hacerse constar las circunstancias, inclu-

yendo fecha y lugar exacto de la confesión. Sin embargo, tales medidas, aunque abonan a la confiabilidad de la confesión, no son indispensables para la admisibilidad.

En casos de confesiones extrajudiciales, la admisibilidad es determinada preliminarmente por el magistrado luego de escuchar y evaluar toda la evidencia relativa a su admisibilidad, en ausencia del Jurado, según lo dispone la Regla 9(C) de Evidencia, 32 L.P.R.A. Ap. IV. De ser admitida la evidencia, "el acusado podrá presentar al jurado y el ministerio público refutar evidencia pertinente relativa al peso y credibilidad de la confesión y las circunstancias bajo las cuales la confesión fue obtenida". Regla 9(C) de Evidencia, *supra*. Por virtud de la anterior disposición, corresponde al juzgador de los hechos, en este caso al Jurado, determinar finalmente la validez y confiabilidad de dicha confesión.

En este caso, el apelante tuvo plena oportunidad de impugnar la confiabilidad de la confesión ante el Jurado y éste pudo, a su vez, aquilatar la prueba en el juicio. El Jurado otorgó entera credibilidad al testimonio del agente Quiñones en torno a la confesión. La determinación de confiabilidad de la confesión encuentra fundamento sólido en la evidencia presentada por el Estado y, por lo tanto, en ausencia de indicio alguno de pasión, prejuicio, parcialidad o error manifiesto, no intervendremos con dicha determinación.

Examinada la evidencia presentada y vistas en su totalidad las circunstancias que rodearon la confesión, resolvemos que ésta era admisible y que no fue producto de violación alguna de los derechos constitucionales del convicto. El tercer error sobre la admisibilidad no fue cometido.

## VI

El apelante señala en su cuarto señalamiento que erró el tribunal de instancia al admitir en evidencia ciertas fotografías grotescas del cadáver de la víctima. Eran dos (2)

fotografías a color, tamaño de 8 × 10 pulgadas, que fueron oportunamente objetadas por la defensa al alegar que ellas constituían evidencia acumulativa y cuyo valor probatorio era excedido por el impacto perjudicial que éstas podían tener sobre el Jurado. El juez de instancia las admitió en evidencia. El apelante sostiene ante nos que, al amparo de la Regla 19(a) de Evidencia, 32 L.P.R.A. Ap. IV, las fotos debieron ser excluidas dado el perjuicio indebido que podían provocar.([7])

La Regla 19 de Evidencia, 32 L.P.R.A. Ap. IV, dispone que "[e]videncia pertinente *puede ser excluida* cuando su valor probatorio es de poca significación en relación a cualesquiera de estos factores: a) Peligro de causar perjuicio indebido[;] b) probabilidad de confusión[;] c) desorientación del jurado[;] d) dilación de los procedimientos[,] e) innecesaria acumulación de prueba acumulativa". (Énfasis suplido.)

Esta regla, análoga a la 403 de las Reglas de Evidencia federales, establece un principio de exclusión discrecional, pues, a diferencia de las demás reglas de exclusión, se trata de una norma potestativa y no mandatoria. E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1985, Vol. 1, pág. 62. Ésta le permite a los tribunales de instancia excluir discrecionalmente la evidencia pertinente luego de sopesar el valor probatorio de la evidencia frente a los otros factores de exclusión señalados en la regla.

Al ejercer el balance de intereses de la Regla 19 de Evidencia, *supra*, reconocemos a los tribunales de instancia una amplia discreción y le conferimos gran deferencia a sus determinaciones. Como regla general, no intervendremos con tales determinaciones salvo en casos de abuso de discreción. Con lo anterior en mente, nos corresponde exa-

---

([7]) Las fotografías son un tipo de evidencia demostrativa que, por virtud de la Regla 80 de Evidencia, 32 L.P.R.A. Ap. IV, será admisible siempre que: (1) sea pertinente a tenor con la Regla 18; (2) sea previamente autenticada y (3) siempre y cuando no sea necesario excluirla por alguno de los factores de la Regla 19. *Pueblo v. Echevarría Rodríguez I*, 128 D.P.R. 299 (1991).

minar si el magistrado abusó de su discreción al no excluir las fotos, considerando el alegado prejuicio indebido frente a su valor probatorio.

█ Anteriormente hemos sostenido que las fotografías son un tipo de evidencia demostrativa de inmenso valor probatorio cuando éstas se presentan para fines de, entre otras cosas: (1) ilustrar los hechos esenciales sobre los cuales han declarado los testigos, *Pueblo v. Torres*, 75 D.P.R. 231 (1953); (2) demostrar lesiones sufridas, *Pueblo v. Pacheco Stevenson*, 83 D.P.R. 842 (1961); (3) ilustrar las características físicas del lugar del crimen, el sitio desde donde observó un testigo y el lugar donde cayó la víctima, *Pueblo v. Lebrón González*, supra, pág. 101, o (4) para corroborar la veracidad de lo declarado en cuanto a "la localización geográfica de [un] edificio, la escena del crimen y áreas susceptibles de percepción visual por el supuesto testigo". *Pueblo v. Pagán Díaz*, 111 D.P.R. 608, 618 (1981); *In re Colton Fontán*, 128 D.P.R. 1 (1991).

Las dos (2) fotos cuya admisión impugna el apelante fueron presentadas como evidencia con el propósito de ilustrar el testimonio del investigador forense Juan Ortiz Cordero. El investigador declaró sobre el lugar y la posición en que se encontró el cuerpo; el estado avanzado de descomposición en que se hallaba, y que llevaba como vestimenta unos calzoncillos blancos tipo *jockey*.

Una de las fotos mostraba el cadáver de la víctima boca abajo tal como fue encontrado (*Exhibit* 2-B). La otra mostraba la cara del occiso, hinchada, ensangrentada y en avanzado estado de descomposición (*Exhibit* 2-A).

La fotografía que presenta a la víctima boca abajo ilustraba el testimonio del investigador forense y, además, corroboraba el testimonio de la testigo María Santos Lugo sobre el lugar del crimen; la posición en que fue abandonada la víctima; los disparos en la espalda, y la vestimenta que llevaba la víctima. Dicha foto fue correctamente admitida aplicando el balance de la Regla 19 de Evidencia, *supra*.

De otra parte, entendemos que el tribunal abusó de su discreción al admitir la foto que mostraba un acercamiento de la cara del cadáver. Tomando en cuenta el resto de las fotos admitidas en evidencia y el video presentado, su valor probatorio resulta mínimo frente a su efecto inflamatorio y perjudicial. Sin embargo, ante el peso abrumador del resto de la prueba del Estado y visto el proceso en su totalidad, resulta evidente que dicho error no fue *factor decisivo o sustancial* en la sentencia apelada.[8] Por ende, no procede la revocación por tal fundamento.

## VII

Finalmente, señala el apelante que "[c]ometió grave error el Jurado al hallar culpable al acusado basándose en prueba insuficiente en derecho para probar más allá de duda razonable la culpabilidad del apelante", en cuanto al delito de secuestro. Alegato, pág. 29. Sostiene que el elemento de distancia sustancial, constitutivo del delito de secuestro, no quedó establecido por la prueba del Estado.

■ Nuestro Código Penal dispone que comete el delito de secuestro "[t]oda persona que mediante fuerza, violencia, intimidación, fraude o engaño sustrajere a otra para privarla de su libertad". Art. 137 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4178. En esencia, "[e]l acto prohibido consiste en sustraer o detener a una persona y moverla de un sitio a otro, privándola de su libertad". D. Nevares-Muñiz, *Código Penal de Puerto Rico: revisado y comentado*, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1993, pág. 223.

---

(8) Como quinto error, el apelante señaló que el efecto acumulativo de los errores señalados le privaron del debido procedimiento de ley y de su derecho a un juicio justo e imparcial. Hemos reconocido que en ocaciones la comisión de errores en un juicio, vistos en su totalidad, producen un efecto acumulativo que acarrea la revocación de la sentencia apelada. *Pueblo v. Echevarría Rodríguez I*, supra.

El único error cometido por el tribunal a través del proceso en este caso fue la admisión de una fotografía del cadáver. Por lo tanto, no estamos ante un caso de efecto acumulativo de errores.

En *Pueblo v. Echevarría Rodríguez I*, supra, nos enfretamos a un caso similar al de autos en el que la "sustracción" de la persona ocurre en el curso de la comisión de otros delitos. En *Echevarría Rodríguez I* discutimos ampliamente los elementos del delito de secuestro, cuando se comete junto a otros delitos, y adoptamos la doctrina que postula que sustraer a una persona para efectos del delito de secuestro supone moverla o trasladarla de un lugar a otro mediando una "distancia sustancial". En esencia sostuvimos que cuando la víctima es privada de su libertad y su movimiento es breve y *meramente incidental* a la comisión de otro delito, no se configura el delito de secuestro. *Pueblo v. Echevarría Rodríguez I*, supra.

Al describir el *movimiento "meramente incidental"* que no configura el delito de secuestro, citamos con aprobación las ilustrativas expresiones del Tribunal Supremo de California en *People v. Stathos*, 94 Cal. Reptr. 484, 485 (1971):

> The word "incidental" is defined as "subordinate, nonessential, or attendant in position or significance"—"occurring merely by chance or without intuition or calculation ...". (Webster's Third Internat. Dict.)

The Supreme Court has repeatedly emphasized that, in the *Daniels* context, it gives the word a similar meaning. It has *consistently qualified its use of the term "incidental" by the adverb "merely"*. In *Daniels*, describing its intended meaning, it used such expresions as, *movement which "were those natural in "the crime involved, "brief movements"*, mere movement of the victim of a crime should not inevitably lead to the criminal's being indicted of kidnapping". "It is difficult to conceive a situation in which the victim of a robbery does not make some movement under the duress ocassioned by force or fear", [i]t is a common occurrence in robbery, for example that the victim be ... *moved into and left in another room or place, a true kidnapping situation does not exist where the trasportation "played no significant role in the crimes" and "trivial changes of location having no bearing on the evil hand."* (Énfa-

sis suplido y en el original, y citas omitidas.) *Pueblo v. Echevarría Rodríguez I*, supra, pág. 362.

 El caso de autos nos ofrece la oportunidad de aclarar algunos de los aspectos de la doctrina enunciada en *Pueblo v. Echevarría Rodríguez I*, supra. En primer lugar, como se desprende de las expresiones citadas en *Echevarría Rodríguez I,* no existe una medida exacta de distancia necesaria para que se cumpla con el requisito de "distancia sustancial". Asimismo, como se desprende de la discusión vertida en dicho caso, el concepto "distancia sustancial" no sólo implica una medida de espacio, sino que también contiene consideraciones de tiempo o duración del movimiento. Dicho concepto se determinará en cada caso a la luz de los hechos particulares, tomando en cuenta dos (2) factores esenciales, a saber, la brevedad del movimiento y su subsidiaridad con respecto a la comisión de otros delitos.

 Por otra parte, debe quedar meridianamente claro que el hecho de que el secuestro se lleve a cabo en conjunción con otros delitos como el robo, la violación o el asesinato no impide que se configure por separado. Tampoco el hecho de que la sustracción de la persona se lleve a cabo con fines criminales ulteriores distintos de los del secuestro, impide que se configure el secuestro. En *Pueblo v. Echevarría Rodríguez I*, supra, concluimos que se probó el elemento de "distancia sustancial" y se configuró el secuestro, aun cuando la prueba demostró la existencia de un plan criminal cuyo propósito ulterior era dar muerte a la víctima.

En el caso de autos, la prueba de cargo demostró que luego de que el taxista recogiera al acusado Rivera Nazario, la testigo Santos Lugo y al menor M.R. en la carretera de Bayamón a Comerío, se dirigió hacia Levittown. Al llegar a unos condominios llamados Lagos de Plata, el menor le ordenó al taxista que se detuviera y le notificó que era un asalto. La testigo Santos Lugo tomó el volante y se dirigieron a la carretera de Dorado a Cataño. Desde ese mo-

mento, el señor Márquez Fontánez fue sustraído por el acusado con la intención específica de privarlo de su libertad. Para cometer los delitos principales no era necesario obligarlo a quedarse en el automóvil ni llevarlo a otro pueblo de la Isla, privándolo de su libertad. Se trata del delito de secuestro, distinto y separado de la intención primaria del acusado de asaltarle y quitarle la vida a la víctima. La privación de libertad no fue incidental al asesinato.

Nos resta determinar si la evidencia desfilada fue suficiente para demostrar el elemento de "distancia sustancial". Estamos de acuerdo con el apelante en que la sustracción comenzó cuando al taxista le fue anunciado el asalto a punta de pistola y la testigo Santos Lugo tomó el volante, y no desde que los asaltantes abordaron el auto con la intención de robarle. Por otra parte, no surge del expediente la distancia exacta entre el lugar donde el taxista fue privado de su libertad, cerca de los condominios Lagos de Plata, y el lugar yermo y solitario donde finalmente fue asesinado. Sin embargo, de la exposición narrativa de la prueba se desprende que la distancia y el tiempo transcurridos fueron suficientes para demostrar el elemento de "distancia sustancial". Veamos.

Luego de que el menor golpeara en la cabeza al taxista, éste se rodó al asiento del pasajero. El relato que transcribimos a continuación ocurre mientras el automóvil estaba en marcha y era conducido por Santos Lugo: "La testigo cogió el volante y le dio una toalla al occiso [sic] para que se secara la sangre. Mientras iban por la [c]arretera de Dorado el acusado le dijo al occiso [sic] que se quitara la ropa pidiendo las prendas y dinero. Elliot [Rivera Nazario] le señaló que no se pusiera fresco con la testigo. El occiso se quitó los pantalones y los pasó hacia atrás. Siguieron por la carretera hacia Dorado y al llegar cerca del negocio El Caracol el acusado dio órdenes de virar. ... Viran en "U" y más adelante el acusado ordena a la testigo que detenga el vehículo. El sitio era rocoso." E.N.P., págs. 34–35. Allí la

víctima fue sacada del automóvil por la fuerza y el acusado le disparó, provocándole la muerte.

La transcripción anterior demuestra que no se trató de un movimiento breve o meramente incidental al robo o al asesinato. Ese período fue suficiente al menos para que, mientras el automóvil continuaba en movimiento, el acusado le ordenara quitarse la ropa, las prendas y el dinero; el taxista se quitó toda la ropa, camisa, pantalón y sus prendas (al ser encontrado sólo tenía puesta la ropa interior). En medio de la agonía que Rafael Márquez Fontánez estaba pasando, el acusado tuvo tiempo para bromear diciéndole que "no se pusiera fresco" con la testigo Santos Lugo. Luego, continuó el trayecto por la Carretera Núm. 167 hacia Dorado hasta llegar cerca del negocio El Caracol, luego viraron en "U" y continuaron la marcha. Más adelante, en un alejado paraje solitario, detuvieron el vehículo y dieron muerte a Márquez Fontánez. Después de asesinarlo, continuaron hacia Levittown en el taxi de su víctima.

Igual que expresáramos en *Pueblo v. Echevarría Rodríguez I*, supra, pág. 367, "[c]onsideramos que estos hechos no se ajustan a los criterios que antes expusimos relativos a la sustracción incidental. No se trataba de un mero movimiento de un cuarto a otro dentro de una residencia o estructura, ni de breves sustracciones en el área donde se cometía el delito primario o su periferia". Por lo tanto, resolvemos que la prueba fue suficiente para demostrar el elemento de "distancia sustancial" constitutivo del secuestro, y el Jurado acertadamente lo determinó así.

Por los fundamentos antes expuestos, *se dictará sentencia confirmatoria de la emitida por el tribunal de instancia en este caso.*

El Juez Asociado Señor Fuster Berlingeri concurrió sin opinión escrita.