EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ex Parte:<br><br>Telenoticias de Telemundo de Puerto Rico<br>*********************************<br><br>Ex Parte:<br><br>GFR Media, LLC<br>Noticentro de Puerto Rico,<br>Televicentro de Puerto Rico, LLC<br>Overseas Press Club de Puerto Rico | 2019 TSPR 197<br><br>203 DPR _____ |

Número del Caso:  MC-2019-344
                  Cons.
                  MC-2019-366

Fecha:  21 de octubre de 2019

**MC-2019-0344**

**Telenoticias de Telemundo de Puerto Rico:**

        Lcdo. Walter Soto León

**MC-2019-366**

**GFR Media, LLC**

        Lcdo. Roberto Cámara Fuertes
        Lcdo. Jaime Mercado Almodovar
        Lcda. Suleicka Tulier Vázquez

**Noticiero de Puerto Rico**
**Televicentro de Puerto Rico, LLC**

        Lcdo. Manuel R. Purcell-Mattei

**Overseas Press Club**

        Lcdo. Luis A. Guardiloa Rivera
        Lcdo. Cirilo F. Cruz Tejeda

Materia:  Resolución del Tribunal con Voto Particular de Conformidad.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Ex Parte: | | |
|---|---|---|
| Telenoticias de Telemundo de Puerto Rico | MC-2019-344 | |
| ************************** | Cons. | |
| Ex Parte: | MC-2019-366 | |
| GFR Media, LLC Noticentro de Puerto Rico, Televicentro de Puerto Rico, LLC Overseas Press Club de Puerto Rico | | |

RESOLUCIÓN

San Juan, Puerto Rico, a 21 de octubre de 2019.

Se ordena la consolidación de este caso con el **MC-2019-366**.

Examinada la *Petición especial de autorización para el uso de cámaras y equipo audiovisual para la transmisión y grabación del juicio contra Jensen Medina Cardona* presentada por Telenoticias de Telemundo de Puerto Rico, así como la *Solicitud especial de GFR Media, LLC*, la *Moción solicitando utilización de equipo audiovisual de difusión por los medios de comunicación para la cobertura electrónica de procesos judiciales* presentada por Televicentro of Puerto Rico, LLC y la *Solicitud urgente y especial del Overseas Press Club de Puerto Rico*, **se provee ha lugar**.

En cuanto a la *Comparecencia especial y suplementaria a la moción en oposición a [la] transmisión y grabación del juicio contra Jensen Medina Cardona* presentada por el señor Jensen Medina Cardona, el Lcdo. Jorge Gordon Méndez, Lcdo. Orlando Cameron Gordon Pujols y el Lcdo. Jorge Gordon Pujols y a la *Petición de tiempo adicional para responder* y la *Réplica a moción en oposición a la transmisión del juicio contra Jensen Medina Cardona* que presentó Telenoticias de Telemundo de Puerto Rico, **nada que proveer**.

Se autoriza la cobertura electrónica del juicio en su fondo contra Jensen Medina Cardona, caso núms. NSCR201900469; NSCR201900470; NSCR201900471, pautado para el 24 de octubre de 2019, siempre que ello sea en la Sala 305 del Tribunal de Primera Instancia, Sala de Fajardo a través de la Oficina de Prensa y Relaciones con la Comunidad de la Oficina de Administración de los Tribunales.

Este proceso se regirá **en aquello que sea compatible** por lo provisto en el *Reglamento del Programa Experimental para el Uso de Cámaras Fotográficas y de Equipo Audiovisual de Difusión por los Medios de Comunicación en los Procesos Judiciales*, según enmendado. *Véanse* In re Enmdas. Regl. Uso Cámaras Proc. Jud., 193 DPR 475 (2015); *In re* C. 15; Regl. Uso Cámaras Proc. Jud., 188 DPR 424 (2013).

En específico, recalcamos que se observarán estrictamente las restricciones contenidas en la Regla 8 del citado Reglamento, a saber:

(1) La cobertura electrónica mediante el uso de cámaras fotográficas y de equipo audiovisual de difusión estará prohibida en todo procedimiento de naturaleza confidencial según establecido por ley o así dispuesto por orden judicial.

(2) La cobertura electrónica de un proceso judicial, porciones del mismo, o del testimonio de una parte, una persona testigo o una persona perita puede ser prohibida, concluida o limitada *motu proprio* por el juez o la jueza que preside el proceso o a instancia de parte. El juez o la jueza efectuará su determinación tomando en consideración el interés de la justicia en proteger los derechos de las partes, de las personas testigos, y para preservar el orden y la buena conducta que debe imperar en el proceso judicial.

(3) El juez o la jueza podrá ordenar en cualquier momento a los medios de comunicación que suspendan el uso de cámaras fotográficas y de equipo audiovisual de difusión, o podrá conducir el procedimiento en cámara, para evitar la difusión de la presentación en evidencia de cualquier documento o testimonio de naturaleza confidencial o sensitiva.

(4) No se autorizará la cobertura electrónica de los procedimientos celebrados en cámara ni tomas de video o de fotografía cercanas al rostro (*close-ups*) de cualquiera de los participantes en un procedimiento judicial con cobertura electrónica.

(5) Solo se permitirá la transmisión en vivo o en directo de cualquier etapa de las vistas del proceso judicial, por radio, televisión e Internet o por algún medio de transmisión análogo, mediante la autorización expresa del tribunal, previa solicitud específica al respecto y siempre que no se afecten los procedimientos ni los derechos de las partes ni el acceso del público y de los funcionarios o funcionarias a la sede del tribunal.

(6) No se permitirá realizar entrevistas para la difusión ni tomar fotografías en los pasillos adyacentes a la entrada del salón donde se lleva a cabo el procedimiento o donde se estén efectuando otros procesos judiciales. Sólo se permitirá en las áreas designadas para ello, que deben ser áreas retiradas de las entradas a los salones del tribunal (por ejemplo, en áreas cercanas a los elevadores o al final de los pasillos); ello de conformidad con la directriz u orden administrativa que regule el asunto.

Se dispone además que la transmisión de la vista se regirá según el procedimiento dispuesto a continuación.

La grabación y transmisión en vivo de la vista se hará a través de un sistema portátil que la Oficina de Prensa de la Oficina de Administración de los Tribunales adquirió para este tipo de transmisión. El mismo faculta la instalación de cámaras de video en las salas de los tribunales y la transmisión remota de las imágenes captadas por éstas a los distintos medios de comunicación. El Director de la Oficina de Prensa, el Sr. Daniel Rodríguez León, o la persona que éste designe, estará encargado de coordinar todo lo relacionado con la transmisión en vivo de la vista mediante este sistema remoto. Todos los interesados deberán coordinar con el señor Rodríguez León para obtener acceso remoto a la transmisión en vivo de la vista.

Por otra parte, a los fines de asegurar la solemnidad y el decoro del proceso judicial, se permitirá la entrada de cámaras de fotografía a ser operadas por representantes de los medios de prensa escrita o digital

(internet). Para regular el uso de cámaras fotográficas, hacemos extensivo, de forma excepcional, el Reglamento del Programa Experimental para el Uso de Cámaras Fotográficas y de Equipo Audiovisual de Difusión por los Medios de Comunicación en los Procesos Judiciales, según enmendado. Los gremios periodísticos deberán regirse por las disposiciones pertinentes del antedicho Reglamento, siempre y cuando no sean contrarias o incompatibles con lo aquí dispuesto. No se permitirá tomar fotografías mediante el uso de equipo electrónico adicional.

También se permitirá, sujeto a las restricciones impuestas en el Canon 15 de Ética Judicial, 4 LPRA Ap. IV-B, y en el Reglamento:

1. El uso de grabadoras de audio portátiles sujeto a que su operación sea discreta y silenciosa.

2. El Uso de computadoras portátiles, teléfonos celulares, tabletas, entre otros dispositivos electrónicos o equipo similar, para recopilar y transmitir información escrita a través del internet, siempre que no interfiera con el proceso judicial, su operación sea silenciosa y discreta y no se utilicen para fotografiar, grabar imágenes o audio, ni para radiodifundir ni televisar.

En la eventualidad que las partes seleccionen juicio por jurado, enfatizamos que **esto no incluye el proceso de desinsaculación del Jurado**. Asimismo, ninguna persona, incluyendo a los miembros de la prensa, podrá utilizar dispositivos electrónicos o equipos similares, entre estos, teléfonos celulares para fotografiar, grabar imágenes o audio, ni para radiodifundir ni televisar <u>desde la sala en que se ventilen los procedimientos</u>, tal como lo establece el Canon 15 de Ética Judicial, *supra*.

Además, ordenamos que bajo ningún concepto se enfocará, se apuntará o se captará la imagen del Jurado o jurado en particular. Esto incluye, y no se limita, a: (1) la entrada del Jurado, (2) durante los procedimientos, y (3) la salida de éstos de la sala. Además de lo anterior, se prohíbe captar y/o grabar cualquier expresión o manifestación audible del Jurado o jurado en particular.

Recordamos a los medios de comunicación que, por la solemnidad del proceso judicial, deben ceñirse estrictamente a las disposiciones aplicables del Reglamento y a lo aquí dispuesto.

Reiteramos que en conformidad con la Regla 13 del citado Reglamento, el Juez o la Jueza que preside el proceso resolverá, según su sana discreción, cualquier controversia o aspecto no previsto en el mismo.

Se instruye al Director de Prensa de la Oficina de Administración de los Tribunales que brinde el apoyo técnico y logístico necesario para garantizar el cumplimiento de las normas reglamentarias aplicables.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Kolthoff Caraballo emitió un voto particular de conformidad. El Juez Asociado señor Rivera García hace constar la siguiente expresión a la que se unió la Jueza Asociada señora Pabón Charneco:

> "Disiento por los fundamentos que expuse en mi voto particular de conformidad en parte y disidente en parte en *In re Enmdas. Regl. Uso Cámaras Proc. Jud.*, 193 DPR 475, 490-501 (2015), en referencia a las salas de asuntos criminales. Por lo tanto, hubiera provisto ***no ha lugar*** a la *Petición especial de autorización para el uso de cámaras y equipo audiovisual para la transmisión y grabación del juicio contra Jensen Medina Cardona* presentada por Telenoticias de Telemundo de Puerto Rico; GFR Media, LLC; Televicentro of Puerto Rico, LLC, y Overseas Press Club de Puerto Rico".

El Juez Asociado señor Feliberti Cintrón hace constar que proveería "no ha lugar" a las solicitudes presentadas para transmitir el juicio por jurado en este caso. La Juez Asociada señora Rodríguez Rodríguez no intervino.


                              José Ignacio Campos Pérez
                              Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Ex Parte:<br><br>Telenoticias de Telemundo de Puerto Rico<br><br>\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*<br><br>Ex Parte:<br><br>GFR Media, LLC<br>Noticentro de Puerto Rico,<br>Televicentro de Puerto Rico,<br>LLC<br>Overseas Press Club de Puerto Rico | MC-2019-344<br><br>Cons.<br><br>MC-2019-366 | |

Voto Particular de Conformidad emitido por el Juez Asociado señor Kolthoff Caraballo.

En San Juan, Puerto Rico, a 21 de octubre de 2019.

Por el revuelo que ha surgido tras la transmisión televisiva de la Vista Preliminar de este caso, y las distintas críticas y preocupaciones surgidas en la comunidad jurídica y en el público en general, me veo obligado a expresarme. Como ha sido desde un principio mi posición con relación a este tema, estoy convencido de que, además del beneficio de un pueblo mejor informado de lo que ocurre en nuestras salas de justicia, la transparencia que provoca la transmisión televisiva en vivo de nuestros procesos judiciales son un excepcional antibiótico que ayuda a combatir la bacteria de la mediocridad, y un gran estímulo para la excelencia de nuestro sistema de justicia.

Sin embargo, todo tiene un costo y en este ámbito terrenal nada es perfecto. En un mundo utópico, claro está, no haría falta un sistema de justicia criminal ni una prensa que informara

con relación a la actividad criminal y que fiscalizara continuamente los procesos en los tribunales de justicia y las instituciones de ley y orden. Evidentemente, nada de eso será nunca una realidad. Los crímenes lamentablemente y en mayor o menor grado seguirán ocurriendo; nuestro sistema de justicia y nuestras instituciones de ley y orden, por mucho mejoremos, siempre estarán muy lejos de la perfección; y el principio cardinal de una prensa libre de toda presión se encuentra en un roce continuo con el insalvable conflicto entre la función del periodista y el giro o enfoque "mediático" que pretende el medio para quien este trabaja, y que necesita "vender el evento o la noticia". Ciertamente, no es un mundo perfecto, y la sociedad puertorriqueña y sus instituciones públicas y privadas son un mero reflejo de esto.

Como mencioné, múltiples opiniones, críticas y sugerencias han surgido en torno a lo que fue la transmisión televisiva en vivo de la referida vista preliminar. Todas esas expresiones requieren ser consideradas y analizadas con el más alto sentido de seriedad y responsabilidad. Sin embargo, y como detallo más adelante, para este servidor la publicidad excesiva por parte de los medios que pudo haber recibido la pasada vista preliminar en este caso, se hubiera disminuido en gran medida si el distinguido Tribunal de Primera Instancia hubiera hecho un mejor uso de los controles del proceso que les proveen las Reglas de Procedimiento Criminal y de Evidencia y la jurisprudencia aplicable. Esto, considerando sobre todo la etapa en que se

encontraba el proceso. En varias ocasiones hemos dicho que una vista preliminar no puede convertirse en un mini juicio, **y el hecho de que el proceso esté siendo transmitido televisivamente no cambia esa pauta**. Corresponde entonces al magistrado que preside limitar el proceso al recibo de aquella prueba realmente necesaria para que el Tribunal pueda determinar la probabilidad de que se cometió el o los delitos denunciados. Para eso, en la mayoría de las ocasiones basta con la examinación de uno o dos testigos presenciales que le merezcan veracidad al juzgador, sin necesidad de autenticar y considerar prueba dirigida simplemente a corroborar lo que estos han de verter.

Ciertamente, estoy consciente que las cámaras de transmisión en vivo de los procesos judiciales traen complicaciones. Esas complicaciones son aun de más trascendencia cuando autorizamos, como en este caso, la transmisión de un proceso penal. Sin embargo, Puerto Rico no es la única jurisdicción que ha enfrentado estos retos. De hecho, la realidad es que hemos sido prácticamente los últimos en iniciar lo que es una realidad hace décadas en la mayoría de los estados de la Nación Americana.

Lo importante es que, aún para casos criminales por jurado, nuestro sistema cuenta con las herramientas y salvaguardas necesarias para alcanzar ambos objetivos: la transmisión televisiva en vivo de los procesos, mientras se salvaguardan con precisión los derechos constitucionales de todas las partes. Como todo, esto conllevará y ha conllevado ya ajustes que tomarán

tiempo. Por parte de esta Curia, requiere la evaluación y reglamentación continua de manera que un procedimiento ordenado permee en la solicitud y transmisión en vivo de cada proceso judicial. En ese contexto, es evidente la necesidad de que **todos**, jueces, abogados de defensa, fiscales y los medios de comunicación nos ajustemos a estas reglas y cooperemos hacia ese fin. Lo contrario sería permitir que continúe avanzando este ya no tan joven siglo sin estar preparados o, peor aún, resistiéndonos a la realidad de que vivimos en la era de una sociedad mediática.

I

Telenoticias de Telemundo de Puerto Rico (Telemundo) presentó una *Petición especial de autorización para el uso de cámaras y equipo audiovisual para la transmisión y grabación del juicio contra Jensen Medina Cardona* y, a raíz de esta solicitud, emitimos una Resolución para que, dentro del término de 10 días, las partes expusieran su posición en cuanto a la petición del canal.

En el interín, GFR Media, LLC, presentó una *Solicitud especial de GFR Media, LLC*, Televicentro de Puerto Rico, LLC presentó una *Moción solicitando utilización de equipo audiovisual de difusión por los medios de comunicación para la cobertura electrónica de procesos judiciales* y, finalmente, Overseas Press Club de Puerto Rico presentó una *Solicitud urgente y especial del Overseas Press Club de Puerto Rico* (MC-2019-366). Éstos, al igual que Telemundo, solicitaron la autorización para

el uso de cámaras y equipo audiovisual durante la celebración del juicio en contra del Sr. Jensen Medina Cardona (señor Medina Cardona o acusado) señalado para el 24 de octubre de 2019. En cumplimiento con nuestra orden, las partes comparecieron.

En primer lugar, el señor Medina Cardona presentó una *Moción en oposición a transmisión y grabación del juicio contra Jensen Medina Cardona*. En la misma planteó que el procedimiento en contra del señor Medina Cardona ha recibido una publicidad excesiva y exageradamente perjudicial, al punto que entiende que la ciudadanía tiene la mente claramente formada. Afirma que durante la transmisión de la vista preliminar el derecho constitucional del acusado a un juicio justo e imparcial fue lesionado. Consideró, además, que la transmisión desmedida y descontrolada hará imposible conseguir los candidatos a Jurado que puedan ser imparciales, que no se hayan expuesto previamente a la prueba ni contaminado con la misma. Además, adoptó los planteamientos que el grupo de Abogados de Puerto Rico (grupo cibernético en la plataforma de Facebook) dirigidos a la Lcda. Verónica N. Vélez Acevedo, Directora del Secretariado de Conferencia Judicial y Notarial de este Tribunal. En apretada síntesis, el grupo esgrimió que la difusión de los procesos anteriores al juicio no deben transmitirse, ello, porque tienen el efecto de limitar o eliminar subrepticiamente la presunción de inocencia, el derecho a un juicio justo e imparcial y otras garantías constitucionales. Como grupo entienden el derecho constitucional que le cobija a la Prensa, pero argumentaron que

la publicación excesiva no es un derecho irrestricto, por lo que es deber del Tribunal de Primera Instancia observar los criterios que esbozamos en Pueblo v. Rivera Nazario, 141 DPR 865 (1996). En específico, el grupo expuso que debíamos prestar atención al criterio de la conducta del fiscal y su interacción con el Canon 13 del Código de Ética Profesional, *infra*.

Sobre este último aspecto, el acusado aseveró que las manifestaciones del fiscal a cargo del caso, el Lcdo. Yamil Juarbe Molina, ante la Prensa sembraron en la ciudadanía una sed de venganza y un juicio predeterminado, violentando así los principios y derechos más básicos del acusado. Para sustentar su posición, ejemplificó algunas de las expresiones del ministerio público, a saber: "…que venga aquí y de la cara… a responder por lo que hizo… actuó de forma sanguinaria y destemplada" y, que además expresó, que "la prueba era contundente y que lo que se ve en el video era un asesinato", ello en alusión al proceso de la vista preliminar celebrada. La defensa argumentó que la fiscalía aprovechó la cobertura de los medios de comunicación para realizar conferencias de prensa improvisadas, incluso dentro del tribunal, para emitir opiniones de la prueba que se encuentra ante la consideración del foro de instancia. Por esto, aseguró que el Ministerio Fiscal lo hizo con el propósito de influir en el ánimo del juzgador de los hechos y en el público en general.

El revuelo sin precedentes, según el señor Medina Cardona, puso en riesgo su vida e integridad física y la de sus familiares

más cercanos. Sobre este particular, aludió a la existencia de un movimiento convocado en las redes sociales para una alegada cacería humana del señor Medina Cardona.

Otro asunto, por cierto *novel*, que los abogados del acusado nos plantearon es que sus derechos a la propia imagen, a la intimidad y el de publicidad de imagen para fines comerciales, sin previo consentimiento podrían violentarse en la medida en que una emisora televisiva difunda los procedimientos sin ningún tipo de restricciones. En específico, esbozaron que para la vista preliminar hubo hasta una cobertura especial periodística donde abogados criminalistas, comentaron y opinaron sobre los detalles presentados en sala. La preocupación de los letrados se enfatizó en que la utilización de sus imágenes tienen el efecto de una compensación económica pagada por los auspiciadores al canal. En otras palabras, según el señor Medina y sus abogados, la falta de un protocolo en el *Reglamento del Programa Experimental para el uso de Cámaras Fotográficas y Equipo Audiovisual de Difusión por los Medios de Comunicación en los Procesos Judiciales* (Reglamento del PECAM) que establezca un balance entre la capacidad de mantener informado al público con los derechos constitucionales del acusado, tiene repercusiones en el derecho a la propia imagen de los abogados de la defensa, quiénes no autorizaron su explotación para propósitos comerciales.

Por último, el acusado indicó que mientras permitamos la continuación de publicidad excesiva sin ningún tipo de control contra el acusado, se contaminará a los potenciales jurados de

la región de Fajardo donde, por razones económicas, hay una merma poblacional significativa.

Por otro lado, al igual que el acusado, el Procurador General se opuso a la difusión del juicio. En esencia, justifica su postura en el hecho de que expresamente el Reglamento del PECAM no permite la transmisión del juicio en los casos de carácter penal. A pesar de su oposición y de lo dispuesto en el Reglamento del PECAM, reconoció que hemos tomado providencias detalladas y específicas cuando se trata de casos que se atenderán por Tribunal de Derecho.[1] Asimismo, compartió y adoptó para su argumentación, las manifestaciones que realicé cuando denegamos la transmisión del proceso de desinsaculación del Jurado en el caso ELA v. Héctor O´Neill, (DLE2018E0102).[2] Basado en ese voto de conformidad suscrito y en la exclusión expresa del Reglamento del PECAM concerniente al proceso de desinsaculación de Jurado y al juicio por Jurado, planteó que debe existir una prohibición absoluta de transmisión y grabación en esa última etapa. Según afirmó el Procurador General, el procedimiento criminal no culmina con el juicio y, ante la posibilidad de que se disuelva un Jurado, la publicidad excesiva de los procedimientos podría viciar e influenciar el público que

---

[1] Específicamente, el Procurador General se refiere al primer juicio por Tribunal de Derecho que permitimos su transmisión y grabación. Esta solicitud la realizó Telenoticias, Telemundo de Puerto Rico (Telemundo) en el caso Pueblo v. Juan Cornier Torres (Caso Núm. JVI201960001).

[2] Ex parte Noticentro de Puerto Rico, Televicentro de Puerto Rico, LLC., 201 DPR 319 (2018).

comprendería un nuevo Jurado, violentando así el interés público de un nuevo juicio.

Ahora bien, antes de exponer mi posición al respecto, no podemos pasar por alto otro detalle que, de manera suplementaria, repetida e independiente, procuraba incidir en la prohibición de la transmisión y grabación del juicio del acusado. Éste junto con sus abogados presentaron una *Comparecencia especial y suplementaria a la moción en oposición a [la] transmisión y grabación del juicio contra Jensen Medina Cardona*. Allí, profundizaron el argumento de que la violación a los derechos a la propia imagen e intimidad son indemnizables mediante una de las cuatro causas de acción que reconocimos en <u>Vigoreaux Lorenzana v. Quizno's Sub</u>, 173 DPR 254, 267 (2008). Es decir, afirmaron que la imagen del acusado y de los abogados representan un valor económico y, en consecuencia, tienen derecho a participar económicamente de la comercialización de su propia imagen para propósitos lucrativos o comerciales. Asimismo, expresaron que "a raíz de que el 19 de agosto de 2019, lunes, cuando los medios de comunicación publicaron la noticia del asesinato de la joven Arellys Mercado Ríos[,] todas las coberturas de dicha fecha acentuaban un alegado hecho de que el móvil del crimen haya sido por un celular extraviado". O sea que, desde antes del inicio del encauzamiento y hasta la vista preliminar celebrada en contra del acusado, la publicidad del señor Medina Cardona y sus abogados ha sido cuantiosa y excesiva. Ante este cuadro, y en la alternativa, sugirieron que la

transmisión se canalizara únicamente por los medios que provengan de la Rama Judicial. De esta manera la Prensa no podría utilizar la transmisión de los procesos para pautar anuncios comerciales, pues entendieron que cualquier reproducción se presume la existencia de un interés lucrativo de las emisoras televisivas.

Por su parte, Telenoticias presentó una *Petición de tiempo adicional para responder*, ello para replicar a los planteamientos al derecho a la propia imagen que argumentaron el acusado y sus abogados. A pesar de que no nos expresamos al respecto, Telenoticias presentó una *Réplica a moción en oposición a la transmisión del juicio contra Jensen Medina Cardona*. La emisora televisiva expuso que tanto el acusado como los abogados ignoraron las excepciones codificadas en la Ley Núm. 139-2011 o Ley del Derecho sobre la Propia Imagen cuando se trata de un reportaje noticioso, sátira o parodia y crítica o cometarios que establece el Art. 8 de dicha ley. Asimismo, aseveró que la cobertura noticiosa ni la transmisión del juicio persiguen un propósito comercial, según lo define el Art. 2(h) del estatuto.

Ahora bien, teniendo claro la posición de las partes respecto a la solicitud de los medios de comunicación, y por la particularidad notoria del presente caso, expondré el por qué considero correcta la decisión de permitir la difusión y grabación del juicio por Jurado a celebrase contra el señor Medina Cardona.

II

a.  <u>Canon 15 de Ética Judicial y el Reglamento del PECAM</u>

Desde que avalamos la enmienda al Canon 15 de Ética Judicial[3] y, en consecuencia, aprobamos el Reglamento del PECAM, los medios de comunicación podían informar, únicamente por escrito los acontecimientos en las salas de los tribunales. Claro está, hicimos la salvedad de que "[t]oda persona deberá actuar responsablemente al difundir información de un proceso judicial, por lo que deberá asegurarse que la información que divulgue concuerde fielmente con la realidad de lo ocurrido en el proceso judicial".[4]

Aunque inicialmente la transmisión estuvo limitada al trámite judicial en la Sala de Recursos Extraordinarios del Tribunal de Primera Instancia, Sala Superior de San Juan, mediante la enmienda al Reglamento del PECAM aprobada en el 2015 ampliamos, además, para permitir la transmisión de ciertos procedimientos en asuntos de lo criminal.[5] En esa oportunidad no solo modificamos la definición de "procedimiento judicial" que dispone la Regal 4(j) del Reglamento del PECAM, sino que, además, añadimos la Regla 15 sobre cobertura de procesos judiciales en salas adicionales en los cuales expresamente no se había extendido el PECAM.

---

[3] 4 LPRA Ap. IV-B.

[4] In re: <u>Enmda. Canon 15 Ética Judicial</u>, 188 DPR 424, 427 (2013).

[5] In re: <u>Enmdas. Regl. Uso Camaras Proc. Jud.</u>, 193 DPR 475 (2015).

Así, en lo concerniente a la definición de "procedimiento judicial", ésta se dividió en materia de lo civil y de lo criminal, siendo éste regulado por el inciso (2) de la Regla 4(j) del Reglamento del PECAM. La misma dispone que el procedimiento judicial "[e]n materia criminal comprende únicamente la celebración de juicios por tribunal de derecho, lecturas de fallo y vistas de lectura de sentencia". Es de notar que, mediante esta enmienda, no se amplió de manera expresa la autorización del PECAM a un juicio por Jurado. Sabemos que en el pasado esa norma no constituyó una camisa de fuerza para este Tribunal y, con la inclusión de la Regla 15 en el Reglamento del PECAM, podemos extenderlo a los trámites que estimemos convenientes. La Regla 15 del Reglamento del PECAM postula lo siguiente:

> Los medios de comunicación interesados en la cobertura electrónica de procesos judiciales celebrados en las salas a donde **no se ha extendido el [PECAM]**, podrán solicitar autorización al Tribunal Supremo mediante una moción presentada al menos veinte (20) días antes de la fecha asignada en el calendario para el inicio del proceso. En casos extraordinarios, los medios de comunicación podrán presentar la petición tan pronto advengan en conocimiento del señalamiento. Al momento de presentar la solicitud, deberán certificar que han notificado copia de la solicitud a las partes del caso y al juez o a la jueza que preside el proceso judicial. Las partes, a su vez, tendrán cinco (5) días, contados a partir de la notificación, para expresarse al respecto. El Tribunal Supremo, mediante Resolución, determinará si autoriza o rechaza la solicitud.

Como mencionamos, bajo esta regla, hemos atendido peticiones para la transmisión y grabación de los procedimientos penales en etapas no contempladas de manera expresa por la Regla 4(j)(2) del Reglamento PECAM. Estas solicitudes las evaluamos

con suma cautela y, aunque no es una lista taxativa, para conceder la petición consideramos lo siguiente: (1) la materia de la causa de acción, (2) la etapa en que se encuentra el proceso judicial, (3) los derechos y el perjuicio que pueden sufrir las partes involucradas, para evitar que se afecte la administración de la justicia (4) la fecha en que el foro de instancia notificó la vista que la Prensa interesa transmitir, y (5) si el medio de comunicación presentó su petición dentro del plazo dispuesto por la Regla 15 del Reglamento del PECAM.

En lo que concierne al asunto que esta ante nuestra consideración, y tal como expresé en el voto particular de Ex parte: Noticentro de Puerto Rico, Televicentro de Puerto Rico, LLC., 201 DPR 319, 323 (2018), nunca descarté "la posibilidad de extender la apertura a la Prensa a un juicio que se ventile por Jurado, si se cumple con ciertas condiciones; esto es, siempre y cuando no se enfoque o se apunte en forma alguna a los miembros del Jurado ya constituido, ni algún jurado en particular". En esa ocasión, aun cuando mi postura es clara de que el público en general debe tener acceso a la información sobre los procesos judiciales, expliqué que la transmisión de la etapa de desinsaculación del Jurado "expondría innecesariamente a potenciales jurados que, durante el procedimiento, interactúan de manera activa y cuya participación, además, es preliminar, pues se desconoce si finalmente serán parte del Jurado

seleccionado".[6] Por esto, entiendo que correctamente prohibimos la difusión de la etapa de desinsaculación del Jurado.

Es una realidad que, hasta el presente, de las instancias en las que hemos permitido el acceso a la Prensa, y por ende a la ciudadanía, hemos garantizado la transparencia y la pureza de los procedimientos criminales al establecer unas guías necesarias que el tribunal de instancia y los medios de comunicación deben seguir, conforme lo establece el Canon 15 de Ética Judicial, el Reglamento del PECAM y aquellas medidas que a nuestro juicio sean cruciales para que el proceso se ventile sin perjudicar los derechos de la persona acusada.[7] Las cautelas alcanzadas, incluso, han servido de experiencia para cada petición de la Prensa, asegurando el establecimiento de un protocolo para una difusión ordenada, cuyo efecto sea la creación de un balance entre el derecho del acusado a un juicio justo e imparcial y la capacidad de mantener a la ciudadanía informada. Ciertamente, nuestro proceder ha sido en beneficio de la persona

---

[6] Ex parte: Noticentro de Puerto Rico, Televicentro de Puerto Rico, LLC., supra, pág. 323.

[7] Destacamos que, antes de la enmienda del Reglamento del PECAM en el 2015, estuve de acuerdo con lo siguiente:

> [L]a adopción de dicho reglamento no limita en absoluto nuestra facultad como Tribunal Supremo para adoptar otras *reglas*, ni emitir *órdenes* en un caso en particular, como lo hicimos en el caso de autos. Eso es posible gracias a la enmienda al Canon 15 que permite dicho proceder. Por todo lo anterior, la autorización que concedimos fue según lo dispuesto en dicho Canon y nuestro poder inherente. Voto de conformidad emitido por el Juez Presidente Señor Hernández Denton, al cual se unen los Jueces Asociados Señor Martínez Torres y Señor Kolthoff Caraballo. ASPRO Ex parte II, 189 DPR 838, 840-41 (2013).

acusada y, de manera paralela, acertada en la medida que procuramos fomentar que la ciudadanía confíe en la Judicatura.[8]

Ahora bien, si antes la transmisión de un juicio por Jurado parecía ser una posibilidad, como garantes de los derechos constitucionales de la persona procesada y de la Prensa, hoy podemos convertirlo en una realidad natural dentro de nuestro sistema judicial.[9] Es indudable que la actitud de apertura a los trámites judiciales que ha tenido la Mayoría de este Tribunal ha sido un reto grande, y por lo visto, no es imposible llevarlo al próximo nivel.[10] Los peldaños que, poco a poco, hemos logrado nos brinda la oportunidad de conceder la transmisión de un juicio por Jurado en un caso de alta notoriedad mediática como el presente.[11]

Reconocemos que no todos los casos penales son iguales y, como mencionamos, la oportunidad de abrir las puertas de la Judicatura para que la ciudadanía se mantenga informada de los procedimientos que se atienden en los tribunales requiere la formulación de un protocolo que permita una difusión ordenada. Así, como en ocasiones anteriores, es saludable establecer de antemano unas guías necesarias a la Oficina de Prensa de la

---

[8] Véase, Voto de conformidad de este servidor en ASPRO et al., Ex Parte I, 189 DPR 769, 776-783 (2013).

[9] ASPRO et al., Ex Parte I, *supra*, págs. 781-782.

[10] Íd, pág. 783.

[11] Debemos señalar, no obstante, que de la oposición del señor Medina Cardona no surge que el acusado prefiere ventilar su caso por tribunal de Derecho. Por lo tanto , y en atención a lo esbozado en su escrito y hasta tanto no se haya determinado otra cosa, se presume que el acusado ejercerá su derecho constitucional a un juicio por Jurado.

Oficina de Administración de Tribunales (Oficina de Prensa de la OAT) y al juez o jueza del Tribunal de Primera Instancia que presidirá el juicio del señor Medina Cardona. Es decir, las guías que surgen de la Resolución emitida procuran salvaguardar los derechos tanto del señor Medina Cardona como los de la Prensa y del público en general.

b.   Pueblo v. Rivera Nazario

En Pueblo v. Rivera Nazario, 141 DPR 865 (1996), evaluamos "el alcance del derecho del acusado a un juicio justo e imparcial frente a la libertad de prensa y el derecho del pueblo a estar informado sobre los incidentes de un proceso penal".[12]   Por la importancia que revistió esta controversia, resulta oportuno reproducir nuestras expresiones:

> [N]uestra Constitución consagra expresamente el derecho de todo acusado de un delito grave a que su juicio se ventile ante un Jurado imparcial. Además, tiene derecho a que se le pruebe la acusación mediante prueba admisible y no por influencias extrañas al proceso. Por ello, la publicidad adversa que se despliega con antelación al juicio tiene particular relevancia para el tribunal, dada la posibilidad de que menoscabe los mencionados derechos del acusado.
>
> Sin embargo, es un principio firmemente establecido en nuestra jurisprudencia que la publicación de noticias acerca de los hechos e incidentes de un proceso penal no violenta per se el derecho constitucional del acusado a un juicio justo e imparcial. Como la criminalidad es uno de los problemas principales de nuestros tiempos, la ciudadanía sigue muy de cerca los actos delictivos más notorios y tiene interés en los procesos judiciales que se inicien contra los imputados de los actos delictivos. Constantemente hemos sostenido que "[l]a adjudicación hecha por el juzgador de hechos se encuentra permeada por una presunción de regularidad y corrección y de que el veredicto se sostiene a base de la prueba desfilada". El acusado es quien carga

---

[12] Pueblo v. Rivera Nazario, 141 DPR 865, 874 (1996).

con "el peso de la prueba para demostrar *afirmativa y satisfactoriamente* que las mismas fueron de tal naturaleza, impacto y exposición que le han privado de un juicio justo ante un jurado imparcial".

Dentro de nuestra realidad social y geográfica no podría ser de otro modo. "Lo contrario, inhibiría el que fueran encausados acusados de gran notoriedad o casos revestidos de interés público en una sociedad democrática — que se caracteriza por el flujo de ideas y noticias." Al evaluar en qué consiste un Jurado imparcial, debemos considerar que nuestro ordenamiento constitucional confiere a la libertad de prensa un lugar privilegiado dentro del sistema de libertades civiles. De otra parte, somos conscientes de que los medios de comunicación y difusión en esta era tecnológica poseen un grado altísimo de eficacia, rapidez y alcance. Por todo ello, en un país como el nuestro, de limitada extensión territorial y densamente poblado, sería prácticamente imposible formar un Jurado totalmente ignorante de los detalles de un crimen que por su naturaleza engendran publicidad y alcanzan notoriedad en nuestra jurisdicción. Hoy, más que nunca, "[l]a justicia no puede por tanto depender de la ignorancia, sino de la integridad de los jurados y de la firmeza de su compromiso de resolver guiados únicamente por la prueba que se presenta en juicio".

De ahí que una alegación de prejuicio o parcialidad en un juicio por jurado no puede fundarse exclusivamente en la difusión de las noticias perjudiciales o inflamatorias. Quien alega tal prejuicio o parcialidad debe basar su reclamo en el efecto real que la información difundida haya tenido en el ánimo de los candidatos al Jurado. "A fin de cuentas, la verdadera encuesta en juicios expuestos a mucha publicidad es determinar el estado mental que pudo haber imperado entre el Jurado. Lo realmente importante no es si el Jurado conoció o recuerda el caso en particular por los informes de prensa, sino que puede juzgar imparcialmente."

Ahora bien, una vez el acusado haya demostrado que el caso ha generado publicidad masiva inflamatoria o altamente perjudicial con anterioridad al juicio, es deber de los tribunales de instancia tomar las medidas necesarias para evitar que los miembros del Jurado lleguen a juzgar el caso con una opinión ya formada. El tribunal debe examinar en qué forma la información publicada ha influido el ánimo de los candidatos al Jurado, teniendo en cuenta que su mera exposición,

aun tratándose de publicidad masiva o inflamatoria, no los descalifica automáticamente.

De otro lado, hemos expresado que "[l]os tribunales tienen los poderes y los instrumentos necesarios para seleccionar los candidatos idóneos y minimizar los efectos adversos de la publicidad anterior al juicio". Entre los mecanismos que poseen los tribunales para tales propósitos, hemos reconocido los siguientes: (a) la celebración de un *voir-dire* exhaustivo y riguroso; (b) la concesión a las partes de recusaciones adicionales a las provistas por la Regla 123 de Procedimiento Criminal, 34 L.P.R.A. Ap. II; (c) secuestrar al Jurado una vez éste haya sido escogido y juramentado; (d) impartir instrucciones cuidadosas y detalladas a los jurados, y (e) finalmente y sólo en casos extremos en los cuales no sea posible utilizar los instrumentos antes mencionados para garantizar un juicio justo e imparcial, "el tribunal p[odrá] suspender los procedimientos al amparo de la Regla 109 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, o también puede ordenar el traslado a otra Sala".

En casos cuando la publicidad surge antes o durante la etapa de desinsaculación del Jurado, **el *voir-dire* se convierte en un mecanismo de vital importancia para garantizar al acusado un juicio justo e imparcial. El magistrado que preside el proceso debe sopesar el impacto que la publicidad ha tenido en el ánimo de los candidatos, con el fin de "garantizar que el Jurado que intervendrá en el proceso como juzgador supremo de los hechos será uno imparcial, capacitado y libre de prejuicio". En tales casos es recomendable que se lleve a cabo "un *voire dire* extenso y riguroso que le permita indagar sobre la exposición que han tenido los candidatos a información periodística y la naturaleza de los datos obtenidos a través de las noticias".**

Cada caso deberá juzgarse según sus hechos particulares considerando el *perjuicio real* que pudo causar la información publicada en vista de la totalidad de las circunstancias. El profesor Chiesa resume algunos de los principales factores que han de ser considerados para determinar el *perjuicio real* sufrido: (1) la naturaleza cuantitativa y cualitativa de la publicidad;(2) las medidas tomadas por el tribunal para contrarrestar el potencial del perjuicio; (3) los reclamos del acusado; (4) la determinación de si el Jurado tuvo en efecto conocimiento de información del caso a través de los

medios objeto de prueba en el juicio y si se trata de materia admisible como prueba; [(5)] la disposición de los jurados para emitir su veredicto sólo con base en la prueba, descartando la información extrínseca originada por la publicidad del caso, y [(6)] la conducta del Ministerio Fiscal. (Citas omitidas).[13]

En lo que respecta a las veces que los medios publicaron información del caso, manifestamos los siguiente:

[L]la cantidad de la información publicada no es el único criterio que se debe tomar en cuenta para medir el efecto perjudicial de la publicidad en el ánimo de los jurados. Es concebible que en ciertos casos excepcionales, aun cuando la difusión de la información sobre el caso sea limitada, la naturaleza perjudicial y las circunstancias de la publicación sean tales que provoquen un menoscabo en el derecho a un juicio imparcial del acusado.[14]

Nótese que queda en manos del juez o la jueza que preside el trámite judicial emplear los recursos necesarios y tomar las medidas adecuadas para no violentar el derecho del acusado a un juicio justo e imparcial. **Esto es parte del manejo y control de la sala del tribunal.** Tal como surgió en Pueblo v. Rivera Nazario, *supra*, el foro de instancia realizó un *voir dire* extenso y riguroso para eliminar el potencial perjuicio que la información difundida pudiera causar a la persona acusada. Es decir, el tribunal de instancia preguntó a los potenciales jurados si, a pesar de haber leído, escuchado o visto información del caso en los medios de comunicación, tenían la capacidad para evaluar el caso de manera objetiva y para resolver única y exclusivamente a base de la prueba que se desfilara. Las partes,

---

[13] Pueblo v. Rivera Nazario, *supra*, págs. 874-877. **Véase, además, Pueblo v. Pérez Santaliz, 105 DPR 10, 13-15 (1976).**

[14] Pueblo v. Rivera Nazario, *supra*, pág. 880.

igualmente, tuvieron la responsabilidad de depurar los paneles de jurados -mediante el mecanismo de la recusación- para obtener un Jurado idóneo como juzgador de los hechos.

No debemos pasar por alto que cuando resolvimos el precitado caso en 1996 aun no existían las distintas plataformas cibernéticas y los avances tecnológicos que tenemos en la actualidad. Este hecho es lo que en gran medida provocó la enmienda al Canon 15 de Ética Judicial y la aprobación del Reglamento del PECAM.

En lo que respecta a la conducta del Ministerio Público en cuanto a las alegadas manifestaciones realizadas a la Prensa, éstas las gobierna el Canon 13 del Código de Ética Profesional (Canon 13).[15] En lo pertinente éste advierte lo siguiente:

> El abogado y el fiscal deben abstenerse de publicar o de cualquier manera facilitar la publicación en periódicos o a través de otros medios informativos, **detalles u opiniones sobre casos criminales pendientes o que señalen la probabilidad de casos criminales futuros, pues tales publicaciones pueden obstaculizar la celebración de un juicio imparcial y perjudicar la debida administración de la justicia.** Cuando circunstancias realmente extraordinarias requieran hacer manifestaciones la expresión debe limitarse a las constancias de los autos, sin hacer referencia a la prueba de que se dispone o los testigos que se utilizarán, ni al contenido de sus testimonios.
>
> Tanto el abogado defensor como el fiscal deben evitar en lo posible ser retratados para fines publicitarios y es impropio que un abogado o fiscal aparezca posando en retratos relacionados con casos criminales en los cuales participe o haya participado.

Además, al amparo del Canon 13 y ante la posibilidad de una publicidad excesiva y perjudicial, el foro de instancia puede

---

[15] Pueblo v. Rivera Nazario, *supra*, pág. 880.

emitir una orden de mordaza a las partes con el fin garantizar el derecho del acusado a un juicio justo e imparcial.

III

En la oposición del señor Medina Cardona solo existen alegaciones relacionadas a que la información difundida por los medios de comunicación en etapas anteriores al juicio son desmedidas y perjudiciales. Sin embargo, considero que es al tribunal de instancia, mediante el proceso de desinsaculación del Jurado, a quien le corresponde determinar si la publicidad ha sido de tal magnitud que perjudicaría el derecho del acusado a un juicio justo e imparcial. Asimismo, fuera de la contratación privada cuando el acusado ha comparecido al Tribunal, el señor Medina Cardona no expuso cómo y qué circunstancias han existido o qué trámites infructuosos ha realizado con el Estado que nos convenza de que su vida e integridad física está en peligro. No puedo concebir, cómo en esta etapa, la vida y seguridad del acusado se encuentre en riesgo por la difusión del juicio.

Por otra parte, ciertamente, como expone el Procurador General, la Regla 4(j)(2) del Reglamento del PECAM expresamente no contempla la difusión del juicio por Jurado. No obstante, como vimos, la Regla 15 del mismo cuerpo de normas y nuestro poder inherente así nos faculta a concederlo. En cuanto a los planteamientos de disolución del Jurado y del nuevo juicio, éstos resultan especulativos pues primero es necesario determinar si, en efecto, la publicación fue de tal magnitud que perjudicó al derecho del acusado a un juicio justo e imparcial.

No podemos controlar la connotación que la Prensa le da a una noticia, pero sí garantizar que la transmisión del proceso sea una transparente, o sea, que le permita al público televidente juzgar qué fue lo que realmente ocurrió. Es ahí donde opera el protocolo que con estas guías activamos tanto para el manejo y control de la sala que debe tener el tribunal de instancia como para la oficina de Prensa de la OAT y los medios de comunicación.

Ciertamente, en la medida que en el pasado autorizábamos la difusión de distintos tipos de vistas de los procedimientos en los casos criminales, me convencía que llegaría el momento en que la ciudadanía estaría madura para presenciar desde sus hogares o lugar de preferencia un juicio de alta notoriedad mediática. Las guías establecidas en la Resolución emitida no limitan al juez o jueza del tribunal de instancia que presida los procedimientos del señor Medina Cardona. O sea, llegó el cumplimiento de lo que expresé en ASPRO et al., Ex Parte I, 189 DPR 769, 782 (2013) *"es posible transmitir, incluso de forma televisiva, cualquier proceso judicial, en cualquier etapa."*[16]


Erick V. Kolthoff Caraballo
Juez Asociado

---

[16] (Énfasis suplido). Voto de conformidad de este servidor en ASPRO et al., Ex Parte I, *supra*, 782 (2013).