EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>José A. Torres Figueroa<br><br>Peticionario | Certiorari<br><br>2022 TSPR 17<br><br>208 DPR \_\_\_\_ |
| --- | --- |

Número del Caso: CC-2021-611

Fecha: 8 de febrero de 2022

Tribunal de Apelaciones:

Panel IX

Abogados de la parte peticionaria:

Lcda. Linette Rivera Maldonado
Lcdo. Roberto Ortiz de Jesús

Materia: Resolución del Tribunal con Votos Particulares Disidentes.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

      v.                      CC-2021-0611     *Certiorari*

José A. Torres Figueroa

    Peticionario

RESOLUCIÓN

En San Juan, Puerto Rico, a 8 de febrero de 2022.

Examinada la Petición de *certiorari* que presentó la parte peticionaria, se provee no ha lugar.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Estrella Martínez expediría. La Jueza Presidenta Oronoz Rodríguez disiente y emite un Voto Particular Disidente. El Juez Asociado señor Colón Pérez disiente y emite un Voto Particular Disidente.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

       v.                       CC-2021-0611

José A. Torres Figueroa

    Peticionario

La Jueza Presidenta Oronoz Rodríguez emitió un Voto Particular Disidente

En San Juan, Puerto Rico, a 8 de febrero de 2022.

Una gota que cae sobre una misma roca constantemente puede llegar a quebrarla. En este caso, el mar de gotas fue una serie de errores que se cometieron en la investigación contra un menor de edad de quince años que lo llevó a confesar un crimen. El mayor de estos errores fue el quebrantamiento de las salvaguardas constitucionales que protegen a toda persona sospechosa en Puerto Rico. Por los fundamentos que se exponen a continuación, disiento del proceder mayoritario.

I

Por hechos acontecidos el 29 de agosto de 2018, al joven adolescente José A. Torres Figueroa ("el menor") se le imputó asesinar a su padre por medio de

un arma de fuego. Conjuntamente, se le imputó portar, utilizar, apuntar y disparar esa arma de fuego sin tener una licencia para ello. El Estado también alegó que el menor trasladó e intentó quemar el cuerpo de su padre, limpió la escena del crimen y escondió el arma de fuego que utilizó en la comisión del delito con el objetivo principal de destruir la evidencia.[1]

Después de varios trámites procesales, el 26 de septiembre de 2019, la representación legal del menor presentó una moción de supresión de evidencia para suprimir la confesión que el menor presuntamente hizo durante el proceso de investigación. Allí, expuso que el menor —quien a la fecha de los hechos tenía quince años— fue transportado como sospechoso y retenido ilegalmente por casi ocho horas en la Comandancia de la Policía sin que se le hicieran las advertencias correspondientes. Sostuvo que en ese lugar el menor realizó declaraciones incriminatorias a varios agentes cuando fue interrogado. Expuso que el menor, estando bajo la custodia de la Policía, declaró sin haber renunciado voluntaria, consciente e inteligentemente a su derecho constitucional a la no autoincriminación. En cuanto a ello, la representación legal del menor arguyó que, de un análisis del descubrimiento de prueba, así como del testimonio de los testigos del Ministerio Público se podía concluir que estuvo detenido sin la posibilidad de moverse de la comandancia por aproximadamente 8 a 10 horas. Enfatizó que todo ello ocurrió sin estar acompañado de abogado ni de su madre.

---

[1] Véanse el Art. 93(A) (asesinato en primer grado) y 285 (destrucción de prueba) del Código Penal de Puerto Rico, 3 LPRA sec. 5142 & 5378, así como a los Arts. 5.04 y 5.15 de la entonces vigente Ley de Armas, 5 LPRA sec. 458c & 458n.

Asimismo, la representación legal del menor argumentó que el joven se autoincriminó ante más de un agente investigador cuando se encontraba bajo los efectos de medicamentos psiquiátricos. Señaló que el menor de quince años se hallaba solo y sin comprender lo que significaba una renuncia a su derecho de no autoincriminación. Igualmente, agregó que el menor fue coaccionado por la policía al ser sometido a un interrogatorio viciado. Por todo lo cual, arguyó que la confesión era inadmisible por haber sido obtenida por medio de violaciones constitucionales.

Por su parte, el Ministerio Público se opuso por entender que la moción de supresión no cumplía con los requerimientos procesales establecidos por la Regla 234 de Procedimiento Criminal, 34 LPRA Ap. II, R. 234. Además, sostuvo que el menor fue trasladado de la escena donde se encontró el cuerpo de su padre como testigo y no como sospechoso, que no fue detenido y que se le garantizaron todos los derechos que le cobijaban. El foro primario celebró la vista correspondiente y dictó una *Resolución* por medio de la cual declaró *no ha lugar* la solicitud de supresión de confesión.

El foro primario determinó los siguientes hechos. El menor de quince años acudió a un solar donde yacía el cuerpo de su padre a eso de las 3:00 p.m. aproximadamente y manifestó a unos agentes de la policía que la persona que se encontraba allí era su progenitor. Los agentes de la policía se comunicaron con el agente Arnold García (agente García) para que investigase la escena. El agente García se percató que el menor estaba solo

luego de preguntarle a éste donde estaba su madre. Dicho menor tenía quemaduras en las manos y una laceración en el brazo. El agente García observó al menor nervioso y sudorífico. Luego de una entrevista corta, acordó llevarlo a la Comandancia porque aportaba información de su padre. Como el agente García entendió que el menor debía trasladarse por razones de seguridad y la Fiscal Arroyo lo instruyó a que lo llevara a un lugar seguro. La Policía transportó al menor a la Comandancia en un vehículo oficial. Detrás del carro oficial de la Policía, iba el Sr. José A. Luna (señor Luna), un allegado de la familia. Cuando el menor de edad entró a las facilidades de la Policía, en esta se encontraban más de diez agentes. El señor Luna estuvo sentado cerca del menor, pero se fue luego de quince minutos. Este volvió a ser visto en la Comandancia cerca de la media noche.

Mientras tanto, a eso de las 5:00 p.m., el agente García delegó en otra persona que se comunicara con el Departamento de la Familia para recibir auxilio de dicha agencia. A la Comandancia de la Policía llegó el hermano del menor que no se acercó a este, solo cruzó la mirada y decidió no sentarse cerca del menor de edad. A eso de las 6:00-6:45 p.m. llegó la Agente de Asuntos Juveniles Mayralee Rivera (agente Rivera). La trabajadora social, Rosa Julia Díaz (trabajadora social) llegó a la Comandancia entre las 10:00-10:15 p.m. La información que ella recibió a eso de las 8:30-9:00 p.m. era que había un menor de edad sospechoso de asesinato a quien había que suplirle la capacidad jurídica porque no había una persona responsable para ello.

Cuando la trabajadora social se personó a la Comandancia, solamente entrevistó a la madre del menor, Damaris Figueroa, quien le habló del historial psiquiátrico de este. La madre del menor no estaba en contacto con éste. No se le permitió tener contacto con el menor por una alegada pureza de la investigación. De hecho, la madre del menor le preguntó una y otra vez por este a la trabajadora social. Las observaciones de la trabajadora social en cuanto al menor surgen cuando ella se encontraba presente en la entrevista que le realizaron los agentes de la policía.

El agente García llegó a la Comandancia a eso de las 11:30 p.m. a 12:00 a.m. Luego de que el agente García realizara su investigación, mientras el menor se encontraba en la Comandancia, se generó una sospecha de que el menor participó en la transportación del cuerpo del padre al solar. Cuando llegó a la Comandancia, el agente García se encontró con el Sargento Collazo, la agente Rivera, el señor Luna, la Sra. Silkia Figueroa, tía materna del menor, el hermano mayor del menor y la trabajadora social.

A esa hora, el agente García se movió con el Procurador de Menores, la agente Rivera, la tía del menor de edad, la trabajadora social y el menor a un cuarto para entrevistarlo. No obstante, la agente Rivera salió del cuarto de entrevistas, una vez se movió al menor. El Procurador de Menores no intervino en la entrevista. El agente García no había sido adiestrado en cuanto a las confesiones de menores de edad. El foro primario concluye que a eso de las 12:15 a.m. y el agente García procede

hacerle unas advertencias de ley. Posteriormente se demostró no ser capaz de hacer efectivamente las advertencias de ley al menor de edad.[2]

Cuando el agente García le pregunta "¿Qué pasó esa noche?" el menor de edad le contesta "Lo que te dije".[3] A base de esa expresión, la trabajadora social asume que el menor fue entrevistado por el agente García sin que ella estuviera presente. En la entrevista, que tomó alrededor de cincuenta y cinco minutos a una hora, el menor dio detalles de la muerte de su padre. Tras escuchar las expresiones del menor, el agente García recurre a la agente Rivera para que hablara con el menor. Ni la tía del menor, la trabajadora social ni el propio menor pidieron la presencia de una representación legal.

El menor de edad habló con la agente Rivera a eso de la 1:50 a.m. y mencionó detalles del fallecimiento de su progenitor. La trabajadora social testificó que por momentos el menor lució ansioso y que incluso se afligió. La agente Rivera no cumplimentó la "Declaración de Persona Sospechosa" sino hasta unos días después de la entrevista. El documento no tiene la firma de un adulto encargado y no fue cumplimentado por el menor, ya que este verbalizó estar cansado. La agente Rivera reconoció que el cumplimentar el documento luego de la intervención no es la práctica normal respecto a este tipo de documentos.

---

[2] *Véase*, Anejo V, Transcripción, págs. 57-58.
[3] Anejo II, Resolución del TPI, pág. 5.

Durante todo este proceso, el menor manifestó estar bajo los efectos de 20 pastillas de Klonopin, es decir, clonazepam. Surge que consumía dichos medicamentos porque tenía historial de salud mental, habiendo padecido depresión y ansiedad. El expediente médico del menor tenía datos relacionados con la fecha del 18 de agosto de 2018 y reflejaba que consumía los siguientes medicamentos en el hogar: Prozac 20 mg; Vistaril 50 mg y Risperdal 0.5 mg. El menor recibió servicios de salud mental desde el 7 de mayo de 2018. Ese mismo año había tenido dos hospitalizaciones. El menor reportó uso de sustancias tales como benzodiacepinas y THC. Asimismo, recibió terapias ambulatorias hasta dos días antes de los hechos imputados.

Ante dicho cuadro fáctico, el foro primario declaró no ha lugar la solicitud de supresión de la confesión. En desacuerdo, el menor presentó una moción de reconsideración que se denegó. Inconforme, recurrió ante el Tribunal de Apelaciones mediante una petición de *certiorari*. No obstante, el foro intermedio confirmó la decisión del Tribunal de Primera Instancia. Hoy este Tribunal deniega expedir para corregir las violaciones constitucionales que validaron los foros inferiores.

## II

La prueba que obra en el expediente demuestra que toda la intervención de la Policía con el menor —desde su contacto inicial en la escena del crimen hasta su interrogatorio y eventual confesión— estuvo viciada de principio a fin, tras una tragedia de errores y violaciones constitucionales serias. Un análisis de la "totalidad de las circunstancias" que rodearon

la toma de la confesión aquí en controversia, nos lleva a concluir que efectivamente el Estado no demostró que la mencionada confesión fue precedida por una renuncia "consciente e inteligente" por parte del menor apelante de su derecho constitucional contra la autoincriminación.

El derecho contra la autoincriminación —garantizado por el Art. II, Sec. 11 de nuestra Constitución— ha sido caracterizado como uno de los "más trascendentales y fundamentales del derecho penal y procedimiento criminal que se practica en una democracia como la nuestra". Pueblo en interés menor J.A.B.C., 123 DPR 551, 561 (1989). Por ello, únicamente son admisibles en evidencia las manifestaciones inculpatorias que realiza un sospechoso, sobre el cual se ha centralizado una investigación criminal o un imputado de delito, cuando el Estado demuestra que dichas manifestaciones fueron precedidas por una renuncia voluntaria, consciente, e inteligente del derecho contra la autoincriminación. Miranda v. Arizona, 384 U.S. 436, 444, 475 (1966).

En el caso de los menores de edad, los foros judiciales deben ser más puntillosos al momento de determinar que hubo una renuncia valida a los derechos constitucionales. Al igual que un adulto, un menor de edad debe abandonar el derecho de manera voluntaria, libre y deliberada. Es decir, que no medie intimidación, coacción o violencia de parte de los funcionarios del Estado. Asimismo, la renuncia tiene que ser consciente e inteligente. El menor debe entender a lo que se enfrenta si renuncia al derecho constitucional en contra de la

autoincriminación. Pueblo v. Medina Hernández, 158 DPR 489 (2003); Pueblo v. Rivera Nazario, 141 DPR 865 (1996); Pueblo v. Ruiz Bosch, 127 DPR 762 (1991). Asimismo, al evaluar si la renuncia al derecho contra la autoincriminación de un menor de edad es válida, los tribunales debemos examinar la totalidad de las circunstancias,[4] sobre todo, las circunstancias personales y particulares del sospechoso, el periodo de tiempo que estuvo bajo custodia policiaca antes de prestar la confesión, la conducta policiaca mientras estuvo bajo custodia y si efectivamente estuvo o no asistido por un abogado al confesar. Hemos dicho que una lectura somera y automática de las advertencias de ley correspondientes podría resultar insuficiente si no se indaga sobre la voluntariedad de la confesión ni se evalúa la totalidad de las circunstancias que la rodearon. Pueblo v. Medina Hernández, supra; Pueblo v. Rivera Nazario, supra; Pueblo en interés menor J.A.B.C., supra; Pueblo ex rel. F.B.M., supra. Igualmente, hemos reiterado que "no basta con que el menor, a solas, sin justificación adecuada para la ausencia de un abogado o de un adulto interesado en su suerte y conocedor de sus derechos, renuncie a su derecho a no

---

[4] En Fare v. Michael C., 442 U.S. 707, 725 (1979), el Tribunal Supremo de los Estados Unidos expresó, en lo pertinente, que:
  This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver **even where interrogation of juveniles is involved**. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits —indeed, it mandates— inquiry into all the circumstances surrounding the interrogation. **This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.** (Negrillas suplidas). Véase North Carolina v. Butler, 441 U.S. 369, 374-375 (1979).

incriminarse" <u>Pueblo ex rel. F.B.M.,</u> supra, a la pág. 254.

De entrada, se debe destacar que cuando la Policía primero entró en contacto con el menor en la escena del crimen, a este no se le notificó que era sospechoso ni que estaba sujeto a responder. Según sostiene el Ministerio Público, este no era sospechoso y se le transportó a la Comandancia de la Policía para que proveyera información sobre el finado, quien era su padre. Además, se trasladó por motivos de seguridad por tratarse de un menor. Sin embargo, en contradicción a lo que declararon los agentes que intervinieron con el menor en ese momento, de la propia *Resolución* del Tribunal de Primera Instancia, surge que:

> La Trabajadora Social del Departamento de la Familia, Julia Díaz llegó a la Comandancia de la Policía entre 10:00 p.m. a 10:15 p.m. La información que ésta recibió **para su activación a eso de las 8:30 p.m. a 9:00 p.m.** era que <u>**había un menor sospechoso de asesinato a quien había que suplirle capacidad jurídica porque no había persona responsable**</u>. También **se sospechaba de la existencia de un arma.** La Sra. Díaz sostuvo que el Dpto. de la Familia **puede tardar hasta tres horas en procesar un referido.** (Negrillas y subrayado suplido).[5]

Es decir, aun cuando los agentes de la Policía declararon que el menor no era un sospechoso cuando estaba en la Comandancia, estos llamaron al Departamento de la Familia ante la sospecha centrada en el menor y, por ende, debía estar acompañado por alguien que le supliera capacidad. Desde ese momento, como mínimo, se le debieron hacer las advertencias correspondientes al menor porque ya la investigación se había

---

[5] Anejo II, Resolución del TPI, pág. 3, último párrafo.

centrado en él. No bastaba con que se las hicieran más de cuatro horas después, apenas unos minutos antes de confesar.

En todo caso, para intervenir con un menor por razones de seguridad, los agentes investigadores tienen que cumplir con la Orden General Capítulo 600, Sección 633, de la Policía de Puerto Rico (Orden General 600-633) la cual regula el procedimiento que debe seguir el cuerpo de la policía al momento de intervenir con menores de edad.[6] Según esta, la Policía de Puerto Rico:

> [T]iene la encomienda de garantizar los derechos civiles de toda persona, incluyendo a los menores, esto asegurando que los servicios policiacos se presten de manera equitativa, respetuosa, libre de prejuicios, garantizándole a todo menor un trato justo, el fiel cumplimiento del debido proceso de ley y el reconocimiento de sus derechos constitucionales".[7]

Cuando un Miembro del Negociado de la Policía de Puerto Rico (MNPPR) interviene con un menor de edad y el oficial de la policía entiende que no está relacionado con la comisión de alguna falta, pero es del criterio de "que existe un riesgo para la seguridad, salud e integridad física, mental y/o emocional del menor; el MNPPR asumirá custodia de emergencia". Véase inciso III de la Orden General 600-633; véase, además, Art. 23, Ley Núm. 246-2011, según enmendada, "Ley para la Seguridad, Bienestar y Protección de Menores". Asimismo, al momento de realizar una entrevista de intervención por esta razón es necesario que los agentes cumplan con los siguientes criterios para evitar que la entrevista se convierta en una

---

[6] *Véase*, Orden General 600-633, inciso I, pág. 1.
[7] Íd.

detención investigativa. En estos casos, la Policía tiene que:

a. Hacer una entrevista breve y concisa.
**b. Ejercer el menor control posible sobre la persona, evitando demostraciones de autoridad donde una persona prudente y razonable entienda que no está en libertad de marcharse.**
**c. Evitar mover a la persona del lugar donde se encuentra.**
d. Disponer diligentemente de la entrevista.

Orden General 600-633, inciso III (B) (3) y (5), a las págs. 4-5. (Negrillas suplidas).

Por otra parte, si la policía interviene con el menor por razón de la comisión de un delito o falta, la Orden General 600-633 dispone el procedimiento a seguir. Al respecto, el inciso III (D) indica lo siguiente:

Cuando un MNPPR intervenga con un menor por la comisión de una falta procederá de la siguiente manera:

1. Se cerciorará de que efectivamente se trata de un menor. A estos efectos solicitará a la persona intervenida cualquier documento que demuestre su minoridad. **Leerá en un tono de voz claro y audible las advertencias de ley mediante el formulario PPR-615.3 titulado: "Formulario de Advertencias para Menores",** según lo establecido en la Orden General Capítulo 600, Sección 615 titulada: "Autoridad para llevar a cabo Arrestos y Citaciones".
2. **El MNPPR le explicará al menor que no se admitirá la renuncia por parte de éste a cualquier derecho constitucional que le cobije si no están presentes sus padres o encargados y su abogado.**
. . . . . . . . .
10. **En presencia del padre, madre, tutor o encargado citado, el MNPPR, volverá a hacerle las advertencias legales contenidas en el Formulario PPR-615.3, titulado: "Advertencias a Menor de Edad", cumplimentará éste y requerirá que el menor y su padre, madre, tutor o encargado firmen el citado documento.**
. . . . . . . . .
14. El Agente de la División de Asuntos Juveniles solicitará al Departamento de la Familia la comparecencia de un trabajador social para que funja como defensor judicial, que acompañe al menor durante los procedimientos investigativos y judiciales al someterse el caso al Tribunal para garantizar que el

menor conozca y entienda: (1) los procedimientos que se llevan en su contra; (2) las garantías que le cobijan y (3) las consecuencias jurídicas que podrían resultar de renunciar a éstas. (Énfasis suplido). Íd. inciso III (D) (1), (2), (10) y (14), a las págs. 5-7. (Negrillas suplidas).

Al evaluar la totalidad de las circunstancias de este caso se puede apreciar que los agentes investigadores no cumplieron con los procedimientos requeridos para intervenir con el menor en cada etapa de la investigación. Los agentes declararon que trasladaron al menor por su seguridad y porque estaba proveyendo información sobre su papá. Conforme a la Orden 600-633, esa intervención —la cual se hace porque la persona no se considera un sospechoso— requería que le realizaran una entrevista breve, en el lugar donde se encontraban y evitando demostraciones de autoridad. La Policía incumplió con estos tres criterios. En cambio, tomaron la custodia del menor y lo trasladaron en un auto oficial a la Comandancia, donde lo tuvieron cerca de 8 a 10 horas sin que le fuera notificado que no estaba detenido. Allí llegó aproximadamente a las 5:25 p.m. y estuvo hasta pasadas las 12:00 de la madrugada, momento donde ocurre la confesión. A este nunca se le dio la oportunidad de irse ni se le manifestó que tenía la oportunidad de hacerlo.

Dado lo anterior, es forzoso concluir que, al momento de transportar al menor, este era considerado un sospechoso, lo que requería que se cumpliera con el inciso III (D) de la Orden 600-633, lo que tampoco ocurrió. El menor no estuvo acompañado de abogado o abogada ni de su madre. Tampoco se realizaron las advertencias correspondientes. No surge de los testimonios

vertidos que mientras el menor estuvo detenido en la Comandancia se le leyera el "Formulario de Advertencias para Menores". Tampoco que se le explicara que no se aceptaría ninguna renuncia a sus derechos constitucionales, entre ellos el derecho a la no auto incriminación, sin que estuvieran presentes sus progenitores, encargado o abogado. Además, surge del expediente que el menor era un paciente psiquiátrico y que estaba bajo los efectos de medicamentos ansiolíticos que podrían afectar su comportamiento y toma de decisiones. Es decir, los agentes de la policía incumplieron con los requisitos para intervenir con un menor tanto cuando se le considera como sospechoso como cuando se descarta dicha posibilidad y la intervención es rutinaria. Ello, sin lugar a duda, arroja sombras sobre la confesión del menor. Recordemos que "cualquier entrevista a un sospechoso de un crimen por parte de un Policía tendrá aspectos coercitivos, simplemente por el hecho de que se trata de un oficial del sistema del orden público que, en última instancia, puede provocar que se presenten cargos contra el sospechoso". Pueblo v. Millán Pacheco, 182 DPR 595, 657 (2011).

Por otro lado, al igual que el procedimiento de detención de un menor, la Orden General 600-633 regula lo relacionado a la entrevista o interrogatorio que un miembro de la Policía debe hacerle a un menor de edad cuando lo detiene, como en este caso, bajo la sospecha de la comisión de una falta o delito:

> **E. Interrogatorio**
> 1. El interrogatorio es un procedimiento utilizado para obtener respuestas de un menor que está bajo custodia de un MNPPR. **Antes de interrogar a un menor el MNPPR se asegurará de garantizarle los derechos constituciones que le asisten, los cuales incluyen el**

**proveerle las advertencias legales establecidas en Miranda V. Arizon,384 U.S. 436 (1966), para estos efectos el MNPPR utilizará el Formulario PPR-615.3 titulado: "Advertencias a Menores de Edad"** y seguirá el protocolo establecido en la Orden General Capítulo 600, Sección 615, Supra.

2. **Frente al <u>padre, madre, tutor, encargado, o persona interesada en el mejor bienestar del menor</u>, el MNPPR volverá a hacerle las advertencias legales contenidas en el Formulario PPR-615.3** […], firmará el formulario y requerirá que el menor y su padre, madre, tutor, o encargado firmen el citado documento, haciendo constar la fecha y hora. Las advertencias legales se harán de la siguiente manera: se leerán en voz alta y clara, se explicarán, tanto al menor como a sus padres, tutor o encargado y se cerciorará que las entendieron. En caso [de] que las advertencias legales sean leídas e interpretadas por el Agente de Asuntos Juveniles, el MNPPR deberá estar siempre presente durante dicho acto.

3. El MNPPR no deberá realizar un interrogatorio si no están presentes los padres, custodios y/o tutor legal, o representante legal.

4. El padre, madre, tutor o representante podrán revocar el formulario en cualquier momento. Esto usualmente ocurre cuando la persona ha comenzado a declarar y decide invocar su derecho a permanecer callado o a estar asistido de abogado o cuando ha invocado algunos de sus derechos y decide declarar. En estas circunstancias se tiene que redactar un nuevo formulario con la fecha y hora más reciente y revocará el formulario previamente otorgado. (Negrillas suplidas). <u>Íd</u>. inciso III (E), a la pág. 9.

Como se adelantó, el menor en este caso no estuvo acompañado por su madre en prácticamente ningún momento mientras este estuvo detenido. Es decir, sus progenitores y su representación legal no estuvieron presentes cuando este confesó. Lo anterior se agrava por el hecho de que el menor, además de ser un paciente psiquiátrico, se encontraba bajo los

efectos de clonazepam al momento de ser entrevistado.[8] Los agentes investigadores lo sabían porque el mismo menor lo anunció, sin embargo, continuaron con el interrogatorio. Incluso, el foro primario enunció que:

> La Trabajadora Social, lo describió como; "bastante alerta" **aunque un "poco soñoliento"** en alguna parte del proceso con los agentes, con buena vestimenta; pausado; hacía contacto visual; contestaba que entendía; no estaba llorando; no lucía ansioso o nervioso; no tenía la lengua trabada. **En un momento dado, lo vio parpadear y mover la cabeza (la testigo hizo un gesto como cuando una persona cabecea**). (Negrillas suplidas).[9]

De un análisis objetivo de todas las determinaciones de hecho y del derecho aplicable, vemos que el entrevistado —al momento de confesar— era un menor de edad, paciente psiquiátrico, que se encontraba bajo los efectos de medicamentos ansiolíticos y que no estaba acompañado por sus progenitores ni por un abogado o abogada que le suplieran su capacidad. Lo anterior, incide en que el menor de quince años fuera más susceptible a la coacción que un adulto. Al evaluar la totalidad de las circunstancias, debemos concluir que el menor era sospechoso para los propósitos de Miranda v. Arizona, supra, y de las advertencias que requiere el inciso III (D) de la Orden General 600-633. Lo anterior inclina la balanza a

---

[8] El uso de clonazepam se asocia más comúnmente con letargo, fatiga, sedación, somnolencia y deterioro motor (deterioro de la coordinación, deterioro del equilibrio, mareos). También provoca visión borrosa, confusión, irritabilidad, pérdida de la libido, falta de motivación, agitación psicomotora, alucinaciones, empeoramiento de la depresión, pérdida de memoria a corto plazo y amnesia anterógrada con dosis elevadas. También pueden provocar cambios de personalidad, alteraciones del comportamiento, ataxia, aumento de la frecuencia de convulsiones, trombocitopenia y disforia. H. Basit & C. Kahwaji, *Clonazepam*, https://www.ncbi.nlm.nih.gov/books/NBK556010/ (última visita 21 de diciembre de 2021).
[9] Anejo II, pág. 6 de la Resolución del TPI, segundo párrafo.

colegir que una persona en sus circunstancias se hubiera sentido como sospechoso del crimen investigado por lo que los agentes de la policía debieron instruirle sobre sus derechos antes de realizar la entrevista y seguir el protocolo correspondiente.

Igualmente, un menor de edad que es llevado por un agente investigador a una Comandancia de la Policía, sin que ningún familiar le acompañe, dificultosamente sentiría que tiene la libertad de irse cuando desea. Vale resaltar que el joven no llegó a la Comandancia por sus propios medios, sino que fue llevado por un agente en un vehículo oficial desde la escena de los hechos.

¿Acaso podía renunciar válidamente a sus derechos constitucionales un menor de edad, con: 1) historial de salud mental y tratamiento psiquiátrico, 2) bajo la influencia a medicamentos ansiolíticos, 3) acompañado únicamente por una trabajadora social y su tía materna, 4) sin representación legal, 5) en horas de la madrugada después de ser transportado de una escena del crimen y estar en la Comandancia de la Policía por más de 8 horas sin sus progenitores? A la luz de la totalidad de las circunstancias, de la prueba desfilada, y dando entera deferencia a los hechos probados, mi sentido de justicia no me permite concluir que la renuncia del menor de edad fue voluntaria, consciente e inteligente.

Por ello, considero que hubo una violación a sus derechos fundamentales y lo correcto era suprimir la confesión. La apreciación jurídica del foro primario no corresponde a la

realidad que surge del expediente. Por lo anterior, disiento y hubiese expedido.

                                        Maite D. Oronoz Rodríguez
                                             Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| El Pueblo de Puerto Rico | | |
|---|---|---|
| Recurrido | | |
| v. | CC-2021-0611 | *Certiorari* |
| José A. Torres Figueroa | | |
| Peticionario | | |

Voto Particular Disidente emitido por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 8 de febrero de 2022.

> "A un menor le protege en todo momento la garantía constitucional contra la autoincriminación como parte del trato justo y debido proceso de ley a que tiene derecho". D. Nevárez Muñiz.[1]

Hoy una mayoría de este Tribunal pierde una oportunidad única para, de forma detenida y cuidadosa, evaluar si un menor de edad -- acusado por hechos ocurridos cuando tenía quince (15) años -- renunció voluntaria, consiente e inteligentemente a su derecho constitucional contra la autoincriminación.[2]

Lo anterior, ante un relato de hechos en la **etapa investigativa criminal**, por la alegada comisión de ciertos delitos graves,[3] plagado de serios cuestionamientos sobre la

---

[1] D. Nevárez Muñiz, *Derechos de Menores, Delincuente Juvenil y Menor Maltratado*, 7ma ed. rev., Puerto Rico, Instituto para el Desarrollo del Derecho Inc., 2013, pág. 60.

[2] El Art. II, Sec. 19 de la Constitución del Estado Libre Asociado de Puerto Rico dispone que "[n]adie será obligado a incriminarse mediante su propio testimonio". Const. ELA Art. II, Sec. 11, LPRA, Tomo 1.

[3] A saber: violación al Art. 93(A) (asesinato en primer grado) y Art. 285 (destrucción de prueba) del Código Penal de Puerto Rico, 3 LPRA sec. 5142 & 5378, así como a los Arts. 5.04 y 5.15 de la entonces vigente Ley de Armas, 5 LPRA sec. 458c y 458n.

corrección o no de determinadas actuaciones por parte del Estado. Entre éstas: 1) el trasladado de un menor de edad de la escena donde presuntamente se cometió un crimen a la Comandancia de la Policía, por razones distintas a las establecidas en los protocolos de la referida agencia de seguridad pública mediante la Orden General 600-633;[4] 2) las manifestaciones del menor edad en la Comandancia de la Policía sobre cansancio y fatiga tras llevar más de ocho (8) horas detenido, sin indicación alguna de que estaba en libertad para irse del lugar; 3) la declaración del menor de edad al personal presente en la Comandancia de la Policía sobre haber ingerido, durante ese día, más de una docena de pastillas de "Klonopin"; 4) las manifestaciones de la madre del menor de edad -- a quien se le negó el acceso a su hijo por la presunta pureza de los procesos --  al llegar a la Comandancia de la Policía sobre historial psiquiátrico de éste, por ejemplo, hospitalizaciones y terapias ambulatorias recibidas días antes de los hechos que suscitaron el presente litigio; 5) el testimonio de la Trabajadora Social asignada a este caso, y quien acudió a la Comandancia de la Policía, respecto a que el menor de edad fue previamente entrevistado por cierto agente del orden público sin que ella estuviera presente; 6) una "Declaración de Persona Sospechosa", tomada en la Comandancia de la Policía, sin firma del adulto encargado; 7) la alegada confesión del menor de edad; 8) la ausencia total de representación legal durante el proceso antes reseñado; y 9) los testimonios encontrados de

---

[4] Es decir, no por la seguridad del menor de edad como requiere la referida Orden, sino porque, según declararon los agentes del orden público en Sala, el joven "estaba aportando información de su papá[, la víctima]" y porque sería entrevistado con relación a la muerte de una persona. Véase, *Resolución* del Tribunal de Primera Instancia notificada el 12 de noviembre de 2020, pág. 2; Anejo V del *certiorari*, pág. 31, líneas 21-33.

los agentes de la Policía sobre lo que verdaderamente ocurrió allí.

Como se puede apreciar, a todas luces, aparentamos estar ante un proceso de investigación criminal -- cuyo actor principal es un menor de edad -- con vicios de haberse apartado de las salvaguardas constitucionales más básicas, que le asistían a este último. Correspondía, pues, ejercer nuestro deber como últimos intérpretes de los derechos consagrados en nuestra Carta Magna, los cuales cobijan a la ciudadanía en general sin importar su edad, y expedir el presenta caso para -- como mínimo -- pasar juicio sobre las actuaciones que aquí se le imputan al Estado.

Al emprender esa tarea, acentuamos que, cuando abordamos cualquier asunto relacionado a la niñez y a la juventud -- como el que está ante nuestra consideración -- debemos tomar como punto de partida la política pública que propende el mejor bienestar del menor de edad. Esto es, realizar ese fino "balance entre los diferentes factores que pueden afectar la seguridad, salud, bienestar físico, mental, emocional, educativo, social y cualquier otro dirigido a alcanzar el desarrollo óptimo [de éste]", para así -- y en lo que respecta al presente caso -- determinar si la renuncia de un menor de edad a su derecho contra la autoincriminación fue o no conforme a derecho. Véase, Art. 3(y) de la Ley para la Seguridad, Bienestar y Protección de Menores, 8 LPRA sec. 1101. En cuanto a esto último, huelga recordar que, por los pasados años, se han reportado en el País cifras alarmantes en los niveles de deserción escolar, problemas de salud mental, maltrato y

pobreza entre la población menor de edad.[5] **Realidad de nuestro tejido social que no aparenta distanciarse de la controversia ante nuestra consideración.**

Al este Tribunal negarse a realizar el análisis antes aludido, la consecuencia puede ser solo una: el posible ingreso del menor de edad aquí en cuestión a una institución juvenil. Sobre lo cual, cabe mencionar que, apenas un año atrás la prensa local destacó la crisis de salud mental que sufre la población ingresada a las instituciones juveniles de Puerto Rico, la cual aumentó en un 119% los eventos de ideas, gestos o intentos suicidas o actos de automutilación en el 2020. Véase, Cindy Burgos, *"Modelo insostenible" el de las cárceles de menores en Puerto Rico*, Centro de Periodismo Investigativo, 4 de noviembre de 2021.[6] Cabe preguntarse entonces, aunque no está aquí en controversia, pero a modo de reflexión, ¿es ese el lugar para ingresar a un menor de edad con un cuadro clínico similar al que parece tener el aquí peticionario?

Son pues, éstas y otras más, las razones por las cuales este Foro debe reflexionar sobre su acercamiento a los asuntos que involucran a las personas menores de edad, quienes, reiteramos, son ciudadanos y ciudadanas con iguales garantías constitucionales. Así lo hemos reconocido desde hace décadas atrás cuando se adoptó en nuestra jurisdicción la Carta de Derechos del Niño, la cual suscribe que se le garantizará a toda persona menor de veintiún (21) años "la vigencia efectiva

---

[5] Véase, por ejemplo, Primer Hora, *Estudio revela notable aumento en deserción escolar tras huracán María, los terremotos y la pandemia*, Primera Hora.com, 9 de noviembre de 2021; Ayeza Díaz Rolón, *En alerta por el maltrato infantil*, El Nuevo Día, Primera Plana, 13 de abril de 2020, pág. 4; Sofía Rico, *Tasa de pobreza infantil en Puerto Rico es de 58%*, Noticel.com, 22 de agosto de 2021.

[6] Recuperado de: https://periodismoinvestigativo.com/2021/11/modelo-insostenible-el-de-las-carceles-de-menores-en-puerto-rico-2/

de los derechos consignados en la Constitución [del Estado Libre Asociado de Puerto Rico] y en las leyes y reglamentos que les sean aplicables". Art. 2(1) de la Ley de la Carta de Derechos del Niño, 1 LPRA sec. 412.

**En fin, repasar información y estadísticas como las antes expuestas, solo nos pueden llevar a una conclusión lógica, detenida y desapasionada, a saber: en pleno Siglo XXI, es momento ya de sentarnos a repensar el trato que se le da a la niñez y a la juventud al momento de impartir justicia en nuestro País. Ello, urge aun más cuando se trata del tema de la delincuencia juvenil y el menor de edad maltratado.**

Ángel Colón Pérez
Juez Asociado